UNITED STATES of America,
Appellee,

v.

ONE CARTON POSITIVE MOTION PIC-
TURE FILM ENTITLED "491" (35 mm.
Black & White, 5 Double Reels, 9610
feet, Swedish Soundtrack with English
Subtitles), Janus Films, Inc. (Claim-
ant), Appellant.

No. 286, Docket 30156.

United States Court of Appeals
Second Circuit.

Argued March 29, 1966.

Decided Oct. 20, 1966.

Lumbard, Chief Judge, dissented.

See also D.C., 248 F.Supp. 373.

Ephraim London, Brennan, London & Buttenweiser, New York City (Helen L. Buttenweiser and Patricia A. Garfinkel, Brennan, London & Buttenweiser, New York City, on the brief), for appellant.

Arthur S. Olick, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, New York City, Judith N. Stein, Asst. U. S. Atty., on the brief), for appellee.

Before LUMBARD, Chief Judge, and WATERMAN and MOORE, Circuit Judges.

MOORE, Circuit Judge.

Appellant, Janus Films, Inc. (Janus), a major film distributor in the United States, sought to import a full-length feature Swedish film entitled "491" into the United States. The film arrived in New York City in October, 1964 and, thereafter, was seized under Section 305 of the Tariff Act of 1930, 19 U.S.C. § 1305,[1] by the Collector of Customs on the ground that it was obscene. The matter was referred to the United States Attorney for the Southern District of New York who instituted proceedings in the district court seeking forfeiture of the film. At trial Janus contended (a) that the confiscation of the film was improper for the reasons that Section 305 is unconstitutional on its face, as administered by the Customs Service, and as applied in this case, and (b) that "491" was not obscene. The district court rejected Janus' attack on the statute and the procedures employed to enforce it and held that the film was obscene. 247 F.Supp. 450.

## I.

### Is "491" "OBSCENE"?

"A society which is unable to endure '491' is a sick society; a society which is prepared to learn from it will become a sounder one." Thus wrote[2] a Swedish psychiatrist on January 12, 1964. Concerning the book "491," he said: "Lars Görling's '491' is probably the best textbook on youth psychiatry ever to have appeared. * * * The book and the film complement each other. * * * Between them Lars Görling [the author] and Wilgot Sjöman [the film director] have created something valuable."

The primary question upon this appeal is: does the film come within the prohibition of Section 305—in other words, is it "obscene"? The district court in an able and well-considered opinion found that the evidence presented by the Government established that "(a) To the average person applying contemporary community (national) standards, its [the film's] dominant theme as a whole appeals to the prurient interest. (b) It is characterized by patent offensiveness. (c) It goes substantially beyond the customary limits of candor in description and representation. (d) It is utterly without redeeming social importance." In reaching these conclusions (November 17, 1965), the district court did not have the benefit of the Supreme Court's trilogy of March 21, 1966, namely, A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Com. of Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1; Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 969, 16 L.Ed.2d 31; and Mishkin v. State of

---

1. 19 U.S.C. § 1305 provides in pertinent part:

Immoral articles; prohibition of importation

(a) All persons are prohibited from importing into the United States from any foreign country * * * any obscene book * * * print, picture, drawing, or other representation, figure, or image on or of paper or other material, * * * or other article which is obscene or immoral, * * *. No such articles * * * shall be admitted to entry; and all such articles * * * shall be subject to seizure and forfeiture as hereinafter provided * * *.

Upon the appearance of any such book or matter at any customs office, the same shall be seized and held by the collector to await the judgment of the district court as hereinafter provided; and no protest shall be taken to the United States Customs Court from the decision of the collector. Upon the seizure of such book or matter the collector shall transmit information thereof to the district attorney of the district in which is situated the office at which such seizure has taken place, who shall institute proceedings in the district court for the forfeiture, confiscation, and destruction of the book or matter seized. Upon the adjudication that such book or matter thus seized is of the character the entry of which is by this section prohibited, it shall be ordered destroyed and shall be destroyed. Upon adjudication that such book or matter thus seized is not of the character the entry of which is by this section prohibited, it shall not be excluded from entry under the provisions of this section.

2. Aftonbladet. Stockholm. January 12, 1964. Exhibit C.

New York, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56. Despite the fourteen opinions in these three cases, the "fog in which guides and landmarks appear only dimly and obscurely from time to time" (247 F.Supp. at 463) has not lifted appreciably. Accepting the Supreme Court's appraisal of the judicial burden, "I [too] do not see how this Court can escape the task of reviewing obscenity decisions on a case-by-case basis." [Mr. Justice Harlan, dissenting in *Memoirs,* supra, 383 U.S. at 460, 86 S.Ct. at 998; see also Jacobellis v. Ohio, 378 U.S. 184, 203–204, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964).]

### THE FILM "491"

#### Sponsorship

The appellant, Janus Films, Inc. (Janus) is a producer, importer and distributor of motion picture films. It is a substantial company and has received three Academy Awards over the last seven or eight years. The film "491" was produced in Sweden by Svensk Filmindustri, said to be the oldest production company in the world still in existence. This company produced the first films of Greta Garbo and many of the films of the famous director, Ingmar Bergmann. The director of "491" was Sjöman, a protege of Bergmann. "491" first came to the attention of Janus during the Cannes (France) Film Festival (May 1964). Arrangements were then made for the importation by Janus of the film into this country. The sound track is in Swedish; English subtitles have been inserted. Such a pedigree cannot alter the character of the film, if obscene it be but it at least takes the film out of the category of the truly obscene films produced for exhibition on a Stag Nite at the local men's club. Nor does the Cannes showing sterilize the film of any virulent germs of obscenity but it should entitle the film to a fair appraisal of any serious or social message attempted to be depicted.

#### The Film Itself

"We are judges, not literary experts or historians or philosophers. We are not competent to render an independent judgment as to the worth of this or any other book [film] except as in our capacity as private citizens. * * * If there is to be censorship, the wisdom of experts on such matters as literary merit and historical significance must be evaluated." (Mr. Justice Douglas, concurring in *Memoirs,* supra, 383 U.S. at 427, 86 S.Ct. at 982.) After a brief resume of the content of the film, the expert witnesses should present their views for evaluation and thus furnish guidelines to the court.

The title "491" comes from the 18th chapter of the Gospel according to St. Matthew (18:21–22) wherein Peter asks Jesus, " * * * Lord, how oft shall my brother sin against me, and I forgive him? till seven times? Jesus saith unto him, I say not unto thee, Until seven times: but, Until seventy times seven." Despite a natural curiosity to ask what specific sin would be beyond maximum forgiveness or beyond the pale—the four hundred and ninty-first sin suggested by the title—those who look for meanings which the author may or may not have intended might better accept the answer as a Biblical way of expressing unlimited forgiveness.

The theme of the picture is a sociological experiment in Sweden, not unlike similar experiments in this country, wherein some six youthful delinquents who have been in difficulty with the law are placed in a private home instead of being institutionalized. Their house master or preceptor is a young bachelor named Krister—the Biblical analogy being retained. The experiment is under the supervision of a social agency and its Supervisor is one of the characters in the film. The only price exacted for their freedom, their rooms and board, and a modest weekly allowance is the answering of questions on a wholly voluntary basis, the answers to which might enable the agency better to cope with the delinquency problems troubling Sweden. The ultimate goal of the experiment is, of course, the hoped-for salvage of these blighted lives by having an opportunity

to live in an atmosphere of kindness and forgiveness for their every act, no matter how heinous.

The author, however, has no intention of letting this come to pass. He is determined to have the forces of Evil triumphant at all times. Undoubtedly in asking the questions which the picture poses, the author does not know the answer any better than the rest of us but this frailty should not condemn the Socratic approach. Possibly he is inveighing against the Swedish social agency system, possibly against overpermissive reform methods, and undoubtedly with not too Machiavellian subtlety, he is demonstrating a proposition scarcely original with him that even a Supervisor and a preceptor have their human weaknesses.

Instead of benefiting from their experimental treatment, the author depicts these delinquents as beyond redemption. They steal and sell the furniture and prized possessions of the preceptor, they wreck his personal quarters, they assault each other, they intentionally maim themselves, they indulge in acts with a prostitute of a nature which well might be expected from subnormal or abnormal delinquents, they put their well-intentioned preceptor in the position of accepting money from the prostitute (apparently a crime in Sweden) to buy back his own stolen furniture and they are ultimately the cause of his arrest and of the death by suicide of one of their number. The picture ends—even as many a Greek tragedy—by having Evil prevail and a leering delinquent saying, "But no one blamed me for his death."

Is "491" Utterly Without Redeeming Social Value?

■ Mindful of the admonition that we are judges and not literary experts or philosophers, we turn to the witnesses for guidance in our own ultimate judgment.

The Government called the Assistant Deputy Commissioner of the Bureau of Customs of the Treasury Department,

Irving Fishman, in Customs Bureau service for some 39 years. He conceded that the picture dealt with delinquency, a problem of some social significance. Although he recognized the "Good Samaritan" aspects of the film, he was concerned that "people of various ages who would see the film for the first time" would see "the objectionable part of the film rather than the material which was of social significance." Despite this, the Commissioner concluded that the objectionable aspects outweighed the film's social significance.

Dr. Max Levin, a physician specializing in psychiatry and neurology, believed that a motion picture could have a tendency to excite lustful thoughts and to stir sexual impulses in the viewer but he also believed that "A man walking down the street and seeing a pretty girl, that can stimulate his sexual fantasies or a man reading an item in the newspaper or hearing a remark or hearing a joke, there is almost no limit to the stimuli that can act on a person's sexual thinking and sexual fantasies." This physician-psychiatrist, however, thought that latent homosexuals "might easily be greatly disturbed by this incident [the homosexual scene between the Supervisor and one of the delinquents]," and that the sadistic treatment of the prostitute "would appeal to people who have a sadistic view of sex." On the other hand, he conceded that the overt or latent homosexual could be stimulated by seeing in a motion picture a fully-clothed, very handsome man or a well-built man in a bathing suit. Sadism and voyeurism he recognized abound in current literature and advertising.

From Cyrus I. Harvey, Jr., an officer of Janus, the Government elicited the information that Janus planned to "distribute it ["491"] widely throughout the United States, but would insist that it be shown for adults only." He then referred to many motion pictures, publicly and commercially exhibited, which contained scenes similar to and more obvious than the scenes characterized as obscene in "491."

The Rev. Dr. Dan M. Potter, Executive Director of the Protestant Council of Churches in New York City, felt that the film in its portrayal went "far beyond the general rules of candor" and that its impact would be offensive throughout the entire community.

John Fitzgerald, a freelance writer and entertainment columnist for Our Sunday Visitor, a Catholic weekly, testified that the film lacked artistic integrity, was artistically poor and went beyond the customary national standards of candor but "portrays a social experiment."

David McIntyre, entertainment editor for the Evening Tribune (San Diego) and The Copley News Service, thought that the dramatic presentation of the picture was obscure, that the film went beyond the customary limits of candor and that "The theme is the lack of communication between people."

Janus produced witnesses covering an even broader range. Mr. Amos Vogel, Director of the Film Department at Lincoln Center (New York) said that in his opinion the picture was trying to show "the weakness of the social workers and the system of values which these social workers and psychologists and directors of this institution represent * * * [and] that the problems that these young people have are not so easily capable of resolution." The "method he [the producer] chooses to do that is by indicating how they [the delinquents] slowly degenerate and maybe at the end not so slowly into an almost paroxysm, * * * of evil." The Vogel conclusion was that from various points of view, including the religious and Biblical, "a very eminently respectable and serious theme" was portrayed.

To Mr. Nathan Hentoff, on the staff of the New Yorker Magazine, a writer for newspapers, including a journal for social workers, and on subjects dealing with the rehabilitation of delinquents, "the picture is saying, among other things, that there are increasingly in urbanized society youngsters who for various reasons—societal familial—a combination of them, have become so alienated from the prevailing values and mores of the society as to be potentially a danger to that society and to themselves." His conclusion might be summarized in his answer "in terms of social intent it is a very useful film."

Mr. Stanley Kauffmann, film critic of the New Republic, contributor in this field to many periodicals and university lecturer on film criticism, was of the opinion that the film had at least three "aspects," sociological, religious and human metaphysical. To him the film on the sociological score "is an examination and a criticism of the specific social techniques used in the film for helping juvenile delinquents," on the religious score "a criticism of the Christian doctrine" and on the metaphysical score "a dramatization of a bond being cemented between quite disparate members of society by a recognition of evil in all rather than an aspiration, a common aspiration towards good."

Mrs. Judith Crist, film critic and associate dramatic critic for the New York Herald Tribune, who also reviews movies for a network television show, and characterized by a Government witness "as one of the two most respected critics in the United States," after seeing "491" testified, "I found it was to me a powerful and engrossing film. I thought that it had a great deal to say. I thought it had great intellectual content. I thought it was an extremely moral movie." To Mrs. Crist "the theme is the battle between good and evil * * *. The struggle between good and evil, between the weak and the strong in our society carried through to the rather bitter truth that we know that too often the good is the weak and does not triumph, * * *." Instead of arousing adult "prurient appeal" or lustful desires, she believed the film to be "so completely anti-erotic that, if anything, it fills one with disgust for the very animal nature, for all the sexuality that is in large part there purely by the viewer's inference." Comparing "491" with great movies produced in this

country and currently exhibited, "491" "is the embodiment of everything that is good and pure and unerotic compared with such great movies as we have had, such as [mentioning several]." After describing such movies having "references to every possible known perversion," "lesbianism," "obscene telephone calls," pornographic books, murder, rape and a display of male torso, which "would send any homosexual in the audience out in an absolute twit," Mrs. Crist expressed the view that "the only intent and purpose of these movies, is to titillate and delight the audience in the most lecherous way, whereas a movie like '491' has an artistic intent and a moral theme which it proceeds to prove."

Mr. Bertram M. Beck, executive director of Mobilization for Youth and a consultant to various organizations on juvenile delinquency as well as being an author on social work experiments, referred to experiments similar to those portrayed in "491". He felt that "the writer of the film was viewing the delinquents as persons with serious social, mental illness, that he was not offering us an easy answer as to how they came to be that way; but he was holding up for our attention a mirror to a segment of our society."

The Rev. Howard R. Moody, Senior Minister of the Judson Memorial Church, Manhattan, did not believe that "491" "is sexually provocative" but, rather, believed that "the film is somewhat anti-erotic in its make-up and that those scenes in it which do depict what we usually would call offensive, are not there at all as instruments of arousing lustful desire."

Mr. Archer Winsten, motion picture critic for the New York Post, in his column wrote concerning "491": "It speaks for itself so clearly that anyone with the slightest feeling for art or serious cinema must know that '491' has not one of the earmarks of pornography."

The views of these witnesses had to be reviewed with some care principally because of the opinion of Mr. Justice Brennan in *Memoirs*, supra, at 419, 86 S.Ct. at 978 that "A book can not be proscribed unless it is found to be utterly without redeeming social value," and the opinion of Mr. Justice Douglas, at 426, 86 S.Ct. at 981, that: "The prosecution made virtually no effort to prove that this book is 'utterly without redeeming social importance.' The defense, on the other hand, introduce considerable and impressive testimony to the effect that this was a work of literary, historical and social importance." Certainly the testimony of the witnesses produced by Janus was "considerable and impressive." Here the film, as in *Memoirs* the book, plus the testimony of experts "constituted the entire evidence." These experts presented conflicting views but a fair appraisal of their testimony and the picture as a whole require the conclusion of at least "minimal" (Massachusetts) and "modicum of" (Supreme Court) value. But even though we must hear from the lips of experts and see through their eyes, we should not have to wear the blindfold of Justice throughout the adjudicatory process so as to be completely unaware of the world around us. If *Memoirs* has even a minimal social importance value, in contrast "491" would appear to have greater importance in its attempt to deliver a social message, brutal, stark and unrefined though it be. The restrained but so all-encompassing and accurate analysis of *Memoirs* by Mr. Justice Clark is set forth in his dissent (at 445, 86 S.Ct. at 991) wherein he said, *"Memoirs* is nothing more than a series of minutely and vividly described sexual experiences." In *Memoirs* the reader does not have to listen behind closed doors but is given a ringside seat in the boudoir. In "491" the so-called sexual scenes are but illustrative of the extreme delinquency from which these problem juveniles suffer. And although in "491" the viewer knows exactly what is going to happen, the camera at the last moment circumspectly averts its lens.

The question "as to the manner and form of its publication, advertisement, and distribution" presented in *Ginzburg v. United States*, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 and *Mishkin v. State*

of New York, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56 is not involved here because "491" has not been advertised or distributed. Any effect that such advertising or distribution may have on the obscenity issue will have to await future events.

If "491" is viewed solely as an exhibition on the screen of a series of sexual acts (1) sodomy (buggery); (2) intercourse with a prostitute; (3) a homosexual act; (4) intercourse between the prostitute and a dog; and (5) of self-mutilation then the picture might well be characterized as "utterly without redeeming social significance" or "utterly devoid of social value" (*Memoirs*, 383 U.S. at 420, 86 S.Ct. 975). But to attribute to this two-hour picture, attempting to deal with social problems which in 1966 are not only on our own doorstep but very much over the threshold such a purpose is completely to misunderstand and misview the picture and its message.

To the district court these sexual scenes were the dominant theme—herein our disagreement. To us this case by a wide *a fortiori* margin falls within the Supreme Court's decision in *Memoirs*, supra, and its many decisions which preceded it. See cases cited in United States v. Klaw, 350 F.2d 155, at 158, fn. 2 (2 Cir. 1965).

"CONTEMPORARY COMMUNITY STANDARDS"

▇▇▇ It should be the function of the courts to observe "contemporary community standards" as they are rather than as black-robed Anthony Comstocks would create them. The dangers of judicial censorship have been so thoroughly and so well expounded in various of the opinions in *Memoirs, Ginzburg* and *Mishkin* that further exposition would be superfluous. But "prurient interest," "patent offensiveness," and "customary limits of candor" (meaningful terms as bases for decision) can be defined only in the light of contemporary community standards. "Prurient interest" to the average person as a factor ought to be discarded since *Mishkin* now restricts the term to mean prurient interest to a group interested in the prurient. In short, the Supreme Court has adjusted "the pruri-

ent-appeal requirement to social realties by permitting the appeal of this type of material to be assessed in terms of the sexual interests of its intended and probble recipient group"; *Mishkin*, 383 U.S. able recipient group"; *Mishkin*, 383 U.S. at 509, 86 S.Ct. at 964. With this radical narrowing of the field, it is suggested that the words, scenes or objects which may arouse such interest in individuals or groups can never be ascertained with certainty. Who is to say what goes on in the minds or bodies of the thousands who with rapt attention gaze daily at the human form, male and female, at our metropolitan museums? Or at the diaphanous feminine undergarments with designs or even words at appropriate places displayed in countless store windows and calculated to titillate the average man of our "contemporary community"? Fortunately or unfortunately for the courts such statistics as to prurient thoughts will never be available but a fair estimate might well exceed the total number of the *Ginzburg-Mishkin* clientele.

More objectively, the courts cannot be wholly oblivious to contemporary community standards. A glance at the "movie" advertisements in the daily newspapers reveals that titillating but sure-fire announcement "For Adults Only" in a large number of ads—an admonition guaranteed not only to produce an adult audience but a large number of teenagers with adult ideas. And while "491" is languishing in the basement of the Customs Bureau, "Love and Marriage" is available on the screen to the millions of this city and elsewhere. The reviewer has well selected the title "Realism" for her review of this picture. She tells the story succinctly,

"A naive young Sicilian couple arrive in Naples for their honeymoon, become drunk and greedy, and sell the *droit du seigneur* to a fat yachtsman, who pays them with what turns out to be a bad check. A wife whose jealous husband follows her everywhere manages nonetheless to betray him—once in a public lavatory, once in a private bathroom (while she waves to him through

a window), and once while he is asleep, with her head actually resting on his shoulder. A husband who has been briefly separated from his wife learns, through a neighbor's complaint about the nightly creaking of bedsprings, that his wife has not been faithful in his absence." (The New Yorker, p. 108; August 20, 1966)

Repulsive, revolting, disgusting—all words used by witnesses in describing "491"—feelings assuredly shared by this court and the district court after having seen the film.[3] Horror movies and books could easily arouse the same emotions. Oedipus, Richard III, Macbeth and Hamlet are not exactly pleasant. But the drama of life is not always to be paraded on a stage in light musical comedy or in operettas with happy endings. There is a seamy side. It so happens that many of our authors in recent years have turned to what they call realism. Post World War II authors vied with each other to make sure that the reading public became aware of the language used and the morals practiced under the extraordinary pressures confronting our military men during their wartime existence. The stage and the screen were not slow in creating, or catering to, contemporary standards. The guideline of success became the bustline of the actress. And today realism continues even more rampant. To gauge "contemporary community standards," a glance at the Best Seller list (fiction and general) is revealing. A best seller (general) records the response of hundreds of people, wired on virtually every section of their anatomy to electrical recording devices, while they perform their sexual functions, naturally and artificially, under Kleig lights before a medical group noting, cataloging and analyzing their every reaction.[4] A best seller (fiction), continuing and developing further a technique which proved more than palatable to the community two years ago,[5] introduces a different nymphomaniac every few chapters and to leave nothing to the imagination describes with particularity the stalwart hero's chivalry in accommodating them.[6] As for the self-mutilation scenes, in the same Chapter 18 from which the mathematical calculation which gives rise to the title "491" is taken, appear verses 8–9 of St. Matthew:

"8. Wherefore if thy hand or thy foot offend thee, cut them off, and cast them from thee: it is better for thee to enter into life halt or maimed, rather than having two hands or two feet to be cast into everlasting fire.

"9. And if thine eye offend thee, pluck it out, and cast it from thee: it is better for thee to enter into life with one eye, rather than having two eyes to be cast into hell fire."

This is followed by the parable of the lost sheep (verses 12, 13) wherein the rescue of the one lost sheep is advocated albeit the sheep is but one of a hundred. The ratio of the delinquents here would be substantially less.

3. I personally found "491" repulsive and revolting. I would not favor the adoption of such grossly over-permissive methods of attempting rehabilitation of the delinquents depicted here. Were I to be vested with dictatorial powers, I would ban and destroy the trash (in my opinion) which infests the news kiosks and the movie theatres in certain areas of New York City. I would do all this in the vainglorious belief that I was acting as a Beneficent Tyrant for the good of all Mankind. But the very utterance of these thoughts is more than sufficient reason to shy away from censorship except in extreme cases. If we are to survive, we should probably survive on the Darwinian theory which should include the ability to cope with our current books, stage and cinema including "491."

4. Masters and Johnson, Human Sexual Response (1966). Number 3. Ten Best Seller List (general), New York Times Book Review, August 28, 1966. Analysis based on reports from more than 125 bookstores in 64 U. S. communities.

5. Harold Robbins, The Carpetbaggers.

6. Harold Robbins, The Adventurers. Number 2. Ten Best Seller List (fiction) supra.

We have advanced (or retrogressed) far since the days of Harriet Beecher Stowe but so have our media for expression changed since "Uncle Tom's Cabin." Juvenile delinquency is an ever-increasing social problem. Possibly shock treatment is called for. Shocking though "491" may be to many, may not some constructive ideas for the future result therefrom as well as possible rejection of certain present ideas? "Those who demand restrictions and censorship call for these for the good of others; their own moral integrity being quite adequate." [7] The courts should not take such a Pharisaical approach and declare this film to be "utterly without social significance."

The communities throughout the country are not without protection. They may adopt such reasonable moral codes as they may find appropriate to their own "community standards." Witness the recent legislation in New York (L.1965, chap. 327, Penal Law, McKinney's Consol.Laws, 40, section 484–h, and chap. 372, Penal Law, section 484–i) prohibiting sales to minors of certain specifically described pornographic material. The power of the New York State legislature to pass these actions was recently upheld by the highest court of New York. See The Bookcase, Inc. v. Broderick, 18 N.Y. 2d 71, 271 N.Y.S.2d 947, 218 N.E.2d 668 (1966). And an ordinance of Grand Prairie, Texas, prohibiting the exhibition of any film visible from a public street or highway wherein bare breasts and bare buttocks are shown has recently been upheld. Chemline, Inc. v. City of Grand Prairie, 364 F.2d 721 (5th Cir. 1966). What other censors elsewhere may do with this film is not for present adjudication. The sole question before us is whether "491" is so "utterly without redeeming social value" (*Memoirs*, supra, 383 U.S. at 419, 86 S.Ct. 975) that it may be constitutionally proscribed as obscene. Upon the record, we cannot so declare it.

## II.

*The Administrative Procedures Prescribed and Carried Out Here Under Section 305 Do Not Offend Constitutional Standards*

■ Janus' claim that any federal system of censorship which contemplates restraint prior to distribution is violative of the First Amendment must be rejected. In Times Film Corp. v. City of Chicago, 365 U.S. 43, 81 S.Ct. 391, 5 L. Ed.2d 403 (1961), the Supreme Court held that a requirement of submission of motion pictures in advance of distribution to a system of censorship was not per se unconstitutional. See Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 n. 10, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). While the *Times Film* case dealt with a state censorship system, there is no doubt that Congress can "constitutionally authorize a noncriminal process [for censorship] in the nature of a judicial proceeding under closely defined procedural standards," Manual Enterprises, Inc. v. Day, 370 U.S. 478, 519, 82 S.Ct. 1432, 1453, 8 L.Ed.2d 639 (1962) (Brennan, J., concurring); see 18 U.S.C. § 1461 (bars use of mails to ship obscene materials), whether or not stricter standards should be applied to federal censorship systems than are applied to state censorship systems. See *Memoirs*, supra, 383 U.S. at 456–458, 86 S.Ct. 975 (Harlan, J., dissenting); Roth v. United States, 354 U.S. 476, 505–506, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (Harlan, J., concurring). Section 305 constitutes a valid exercise of congressional power to regulate foreign commerce and the flow of materials into this country from foreign sources.

■ Janus also challenges Section 305 on the ground that the section contains no safeguards against unreasonable delay in obtaining a final determination of the question of obscenity. Principal reliance is placed on Freedman v. State of Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), wherein the Supreme Court stated that a noncriminal

7. See n. 2, supra.

process which requires the prior submission of a film to a censor is valid only if it contains the following procedural safeguards: "First, the burden of proving that the film is unprotected expression must rest on the censor. * * * (Second) the requirement cannot be administered in a manner which would lend an effect of finality to the censor's determination whether a film constitutes protected expression. * * * (Third) the exhibitor must be assured, by statute or authoritative judicial construction, that the censor will, within a specified brief period * * * go to court to restrain showing the film. * * * (Fourth) the procedure must also assure a prompt final judicial decision * *." Id. at 58–59, 85 S.Ct. at 739.

The terms of Section 305, in conjunction with its legislative history and the manner in which it has recently been construed, see United States v. One Book Entitled "The Adventures of Father Silas," 249 F.Supp. 911 (S.D.N.Y.1966); United States v. 302 Copies of a Magazine Entitled "Exclusive," 253 F.Supp. 485 (D.C.Md.1966), clearly demonstrate that they satisfy the requirements set forth in Freedman v. State of Maryland, supra, and that the section is constitutional on its face. Prompt judicial review of administrative action is required by Section 305 which states that "upon the appearance" of obscene material it "shall be seized and held by the collector to await the judgment of the district court * * *. Upon the seizure [of such material] * * * the collector shall transmit information thereof to the district attorney * * * who shall institute proceedings in the district court * * *." (emphasis added).[8] The Collector of Customs is not authorized under any circumstances finally to determine whether material seized is obscene. His sole function is to select material for judicial review. The power to determine questions of obscenity is vested solely in the courts. In fact, the legislative history of Section 305 indicates great hostility, on the part of the Congressmen who devised the section, to administrative censorship and manifests their desire that the question of obscenity should "be quickly submitted to the district attorney and to the court for determination." 72 Cong.Rec. 5422 (1930) (remarks of Senator Swanson); United States v. One Book Entitled "The Adventures of Father Silas," supra, 249 F. Supp. at 915–919; see Manual Enterprises, Inc. v. Day, supra, 370 U.S. at 514–516, 82 S.Ct. at 1450–1452.[9] Moreover, the section does not authorize lengthy administrative proceedings prior to judicial review and imposes no burden on an importer seeking a judicial determination of obscenity where material is detained by the government. Thus, specific time limitations on administrative action are unnecessary and would serve only to inject inflexibility into the regulatory scheme authorized under Section 305.

8. Section 305 as originally proposed in the Senate provided that the Collector should "immediately transmit information to the district attorney" and that the district attorney should "immediately institute proceedings in the district court." In discussing the section, certain Senators urged (among other things) that it should contain a provision for jury trial. Senator Walsh (who proposed the original section) hurriedly rewrote the section in substantially the form that Section 305 was enacted to accommodate the suggestion, but the word "immediately" was left out. There is no indication in the debates, however, "of an intention to allow anything less than a prompt refer- ence for court adjudication." United States v. One Book Entitled "The Adventures of Father Silas," 249 F.Supp. 911, 918 (S.D.N.Y.1966).

9. Further evidence of Congress' intent to obtain prompt judicial review is contained in 19 U.S.C. § 1604 which provides in relevant part: "It shall be the duty of every United States Attorney immediately to inquire into the facts of cases reported to him by collectors and the laws applicable thereto, and * * * forthwith to cause the proper proceedings to be commenced and prosecuted, without delay * * *."

The only restraint contemplated by Section 305 is that reasonably necessary intelligently to select material for judicial review and reasonably necessary for a sound judicial resolution of the obscenity question. Nothing in the section precludes a prompt final judicial determination of obscenity. Indeed, the section is designed to avoid unnecessary delay at both the administrative and judicial stages of the proceedings.

THE ADMINISTRATION OF SECTION 305

(1) *The General Practice*

The Collector of Customs at the initial port of entry has the responsibility for discovering obscene material and bringing it to the attention of the Bureau of Customs in Washington, D. C. The Customs Office at the Port of New York, with which we are concerned, handles approximately ninety per cent of all commercial motion picture films that importers seek to bring into the United States.[10] Films, like other merchandise sought to be imported into this country, must be formally entered through customs and are subject to examination for dutiability and admissibility under Section 305. All foreign imports of commercial film are required to be previewed by a customs official prior to release, i. e., examined by projection on a movie screen. 19 C.F.R. § 12.41(b). Thus, after proper entry has been made, such a film is shipped by the importer or his broker to the projection room at the office of the Collector of Customs. The film is then viewed by a customs official. If he concludes that it is ad-

missible, he is authorized to release it immediately without further review. If he concludes that the film is "unquestionably obscene," he is required to seize it immediately. A report of seizure is then sent to the Bureau of Customs in Washington, and the film is held pending instructions as to whether to refer the matter to the United States Attorney. See 19 C.F.R. § 12.41(c). See also Bureau of Customs Circular RES–15–RM, April 19, 1965. If, however, the reviewer finds that the film's admissibility is questionable, he sends a narrative report to his superior, the Supervisory Administrative Aid in charge of the Prohibited Imports Section of the Division of Imports Control in the Collector's office, who re-screens the film. That official has authority to direct the film's release without further review, or to order seizure of the film if it is considered "unquestionably obscene." Where the second reviewer regards the admissibility of the film as questionable, he has no authority to direct its seizure but must transmit the film, together with a report, to the Assistant Deputy Commissioner of Customs in charge of the Restricted Merchandise Section of the Bureau of Customs in Washington, D. C., for a final administrative ruling on the admissibility of the film. Under such circumstances, seizure is ordered only if the Washington office rules the film inadmissible. On occasion, the Washington office, prior to formally seizing a film, solicits the views of the United States Attorney at the port of entry involved concerning the advisability of challenging the film in judicial proceedings.[11]

---

10. The volume of film dealt with by customs officials at the Port of New York is also indicated by the following figures (a) in 1964, 905 entries of feature films, totaling 6,122,125 ft., were screened (the total amount of film screened, which included informal entries and mail shipments, was 8,149,874 ft.) ; (b) in 1963, 729 entries of feature films totaling 5,482,-423 ft., were screened (the total amount of film screened, which included informal entries and mail shipments, was 7,997,348 ft.).

11. The reason for adopting such a procedure was explained at trial by Irving Fishman, presently Assistant Deputy Commissioner of Customs in charge of the Restricted Merchandise Section of the Bureau of Customs, Washington, D.C., as follows: "The United States Attorney, being our lawyer, we felt that we would like to have the benefit of his advice, which is the procedure we followed in this case, pointing out to him what the Bureau of Customs thought was objectionable in the film." As a practical

When it is decided that a film is inadmissible, the Collector of Customs prepares a report of seizure. At the same time, a notice of seizure is sent to the importer advising him of the seizure and his right to contest the action or to consent to forfeiture of the film. See 19 C.F.R. § 12.40(b).[12] Thereafter, as provided in the regulations, if the importer "declines to execute an assent to forfeiture" or does not seek permission to export the seized film, "information concerning the seizure shall be submitted to the United States Attorney * * * for the institution of condemnation proceedings." 19 C.F.R. § 12.40(e).

The record indicates that customs officials make every effort to expedite the review of films due to the fact that a delay in distribution may inflict substantial economic injury on the film importer.[13] Eleanor Suske, the Supervisory Administrative Aid at the Port of New York, testified that her re-examination of a questionable film usually occurs from two to three business days after formal entry of the film. She also stated that on the

average it takes from two to three weeks to obtain a decision from Washington once it receives a questionable film.[14] There is little probative evidence in the record pertaining to the length of time it takes the Collector of Customs, once formal seizure has been accomplished, to refer the matter to the United States Attorney. It appears, however, that from January 1964 to September 1965 only three full-length motion pictures were seized by the Collector of Customs in New York, and, that in one case the matter was referred to the United States Attorney one day after seizure (judicial proceedings were instituted three days later) and in another (involving "491") the matter was referred to the United States Attorney in four days (judicial proceedings were filed two days later).[15]

■ Janus contends that this procedure for processing films causes undue delay in obtaining judicial review of administrative action. The district court rejected that view on the ground that "the time taken by the Customs Service to consider the matter of referability is

---

matter, such conferences are quite desirable, for the United States Attorney can refuse to act on cases reported to him by customs collectors where he concludes that judicial proceedings "cannot probably be sustained or that the ends of justice do not require that they should be instituted * * *." 19 U.S.C. § 1604. Under such circumstances, the United States Attorney is required to "report the facts to the Secretary of the Treasury for his direction in the premises." Ibid.

12. It should be noted that when a film is initially detained as questionable (as opposed to being formally seized), the importer is notified to that effect. Often when this occurs, the importer requests a conference with customs officials to ascertain what portions of the film are objectionable and he may offer to delete certain portions of the film. Generally, the officials cooperate with the importers in the conduct of such informal conferences.

13. Mr. Fishman (Deputy Commissioner of Customs in Washington, D. C.) pointed

out several reasons why delay should be avoided: (a) producers and exporters are under pressure due to large interest charges accruing on funds borrowed to produce films; (b) a film may be of current interest and depreciate in value with the passage of time; and (c) the distributor importing the film may have a short deadline within which to make a final commitment to the exporter or producer concerning a film.

14. With respect to the twenty-four commercial motion picture films which were referred by local customs offices to the Bureau of Customs in Washington, D. C., for disposition on the issue of obscenity between January 1964 and September 1965, the time between date of transmittal to the Bureau and the date of the Bureau's instruction to the local offices concerning disposition varied from three to twenty-eight days (with the exception of the film involved here). The average time lapse was thirteen days.

15. The record does not indicate when, if ever, the third matter was referred to the United States Attorney.

only that which is reasonably necessary." 247 F.Supp., supra, at 458.

"Customs officials cannot be expected to act immediately on every motion picture * * *. The volume is too great." United States v. One Carton Positive Motion Picture Film Entitled "491," 248 F.Supp. 373, 377 (S.D.N.Y.1965). Any meaningful examination of the admissibility of films under Section 305 requires a reasonable time to evaluate the material. Careful consideration of questionable films is necessary if the Customs Service is to exercise responsibly its duty to select materials for judicial consideration. As the district court pointed out: "It would be manifestly unfair to both the importers and the Government for those in the Customs Service * * * to hurriedly and without adequate consideration transmit imported films to the United States District Attorney." 247 F.Supp., supra, at 458. Moreover, careful administrative review of films of questionable admissibility both avoids the unnecessary expenditure of judicial time and effort and permits the importer to avoid the burdens of litigation, since "in the greater number of cases such review results in the film being released." 247 F.Supp., supra, at 458.[16] Furthermore, review de novo in Washington probably results in a more intelligent disposition of the matter. Thus, we conclude that the present procedure for reviewing films does not unduly infringe on the right of an importer to a prompt judicial determination of obscenity. This position gains support from the fact that the Bureau of Customs is aware of the serious nature of its actions[17] and is firmly committed to a policy of expediting the review of films. Moreover, it is not without significance that local film reviewers have absolute authority to release films which they conclude are admissible. Whether the present procedure has been improperly employed in a particular case and has resulted in an unjustifiable and protracted delay is an entirely separate question. Needless to say, the Customs Service must not lose sight of the fact that "Congress gave to the courts anu juries, not to them, the assertedly 'delicate' role of finally determining obscenity." United States v. One Book Entitled "The Adventures of Father Silas," supra, 249 F.Supp. at 920.

#### (2) The Seizure of "491"

"491" arrived in New York City on October 29, 1964; was delivered to the projection room at the Collector's office on October 30th; and was screened on November 3rd, the third business day after its delivery. The initial reviewer concluded that the film's admissibility was questionable. Thus, it was re-screened by another reviewer the following day who also regarded it as questionable.

---

16. Between January 1964 and September 1965 twenty-four commercial motion picture films were referred from local customs offices to the Bureau of Customs in Washington, D. C., for review. Only three were actually seized. The other twenty-one were released.

17. For example, to take account of the fact that federal courts have recently stressed the importance of obtaining prompt judicial review of administrative action in the censorship area, the Bureau, on April 19, 1965 (Freedman v. State of Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649, was decided on March 1, 1965), issued specific instructions to Collectors of Customs stating (a) that seizure of unquestionably obscene material "should be promptly made and a copy of such seizure report mailed immediately" to Washington; (b) that where obscenity is questionable the material "should be promptly transmitted to" Washington; and (c) that once a determination has been made to refer a matter to the United States Attorney, such action should "be taken immediately and all present procedures which contemplate such reference at stipulated periods should be discontinued." Bureau of Customs Circular RES–15–RM, April 19, 1965. See also United States v. 392 Copies of a Magazine Entitled "Exclusive," 253 F.Supp. 485, 489 (D.C.Md. 1966). The Bureau also keeps the Collectors of Customs apprised of court decisions concerning obscenity. See Bureau of Customs Circular RES–15–PEN, January 15, 1964.

That same day the film, together with a written report, was sent by registered air mail to the Bureau of Customs in Washington, D. C., for disposition of its admissibility and, on November 9th, Janus was notified that "491" was being detained "as in possible violation of § 305." On November 18th, the Deputy Commissioner in Washington requested the Collector of Customs in New York to find out from Janus what purpose it intended to use the film for, since in his view the film appeared "to be of a type which would be utilized for technical purposes by social guidance agencies." On November 23rd, the Collector wrote Janus and on November 30th, Ephraim London, Esq., Janus' lawyer, informed customs that "491" would be used for commercial purposes but that its showing would be restricted to adults. At the same time, Mr. London requested permission to screen the film, which was subsequently granted and he viewed it on December 17th. Nothing was heard from Janus until January 14, 1965 when a second screening of the film was requested and granted. After re-screening the film on January 19th, Mr. London advised customs officials in Washington that he wanted to delete "the scene involving the woman and the dog." That request was granted on condition that the film be returned to customs for re-screening. The reel from which Janus had deleted the scene was returned to the Collector at New York on February 23rd and the film was returned to Washington. Around that time, the Collector asked Janus to return the deleted portion of the film so that it could be disposed of properly, but he was informed that it had been sent back to Sweden. The deleted portion was returned to the Collector in New York on March 22nd and was reinserted into the film.[18]

After re-screening the film, the Washington officials tentatively agreed upon seizure but felt that it should probably be referred to the United States Attorney for his opinion as to the probable success of proceedings under Section 305. On March 17, 1965 this information was relayed to the United States Attorney for the Southern District of New York and the film was viewed in New York by representatives of his office on April 8th. Thereafter, on April 13th the Bureau of Customs instructed the Collector in New York to seize "491." Seizure was effected on April 16th, and on that same day Janus was informed of the seizure "and that prompt steps toward the institution of forfeiture proceedings are to be taken." The matter was referred to the United States Attorney on April 20th and this action was commenced two days later.

■ Although Janus recognizes that it was responsible for much of the delay which occurred prior to the filing of this action, it contends that the time consumed by customs officials in considering whether to seize "491" was unreasonable and resulted in the denial of prompt judicial review. The district court rejected that claim finding that "the delay was largely occasioned by the importer * * * (and) that under the record in this case the Claimant was not denied constitutional due process * * *." 247 F.Supp. supra at 461. We agree.

■ There is no question that Janus was primarily responsible for the delay which occurred between November 30, 1964, when Mr. London initially requested permission to screen "491," and March 22, 1965, when the portion of the film deleted by Janus was returned to the Collector. Moreover, the Deputy Commissioner's inquiry concerning the use of "491," initiated on November 18th was well-founded and the less than two-week period which elapsed between that inquiry and the transmittal of the film to Washington on November 5th cannot be considered in itself an undue delay. Somewhat troublesome, however, is the

---

18. Janus made no objection to the reinsertion of the scene and it was agreed at trial that the film should be judged as a whole.

time which elapsed between March 22nd and April 8th, when "491" was actually viewed by representatives of the United States Attorney's office in New York. While an exchange of views between the members of these two government agencies is practically desirable, see footnote 11, supra, such activity must be conducted in conformity with the procedural safeguards contained in Section 305.[19] Under the circumstances, the intergovernmental consultations did not in themselves unduly delay judicial intervention in the proceedings.[20] Subsequently, both the customs officials and the United States Attorney's office acted with reasonable dispatch.

■ Finally, Janus' claim that the judicial determination of obscenity was delayed for an unreasonable length of time is untenable. The action was instituted on April 22nd but Janus did not file its answer until June 21st. Moreover, on June 7th Janus made a motion for summary judgment which was finally disposed of on August 5th.[21] One week later, on August 12th the Government applied for a trial preference which was granted on August 18th. Trial commenced on September 29th and ended on October 21st after an eleven-day recess requested by Janus. Thereafter, on November 17th the district court issued its opinion. The judicial action was anything but protracted and, as in the administrative proceedings, Janus was largely responsible for any major "delays" which occurred.

The judgment of the district court is reversed.

WATERMAN, Circuit Judge (concurring):

I concur in Judge Moore's opinion. Specifically, I wholeheartedly concur in his approach to the meaning of the adjective "obscene" as that difficult-to-define word is used in 19 U.S.C. § 1305, and in his explication of the role the executive and judicial branches of our Government must play in dealing with "obscene" items if the guarantees of the First Amendment are to be preserved.

Inasmuch as there is powerful judicial authority to the effect that each judge faced with a decision as to whether a book, print, picture, drawing or "other representation" is "obscene" must express an individual judgment thereon I attach my addendum.

It is inconceivable to me that a film so degrading of human dignity and so brutally animalistic and which negates in every particular the mores of our civilization could possibly appeal to the prurience of any average American. It disgusted me as it did my colleagues who, with me, endured its showing. The so-called orgy scene in the merchant ship's crew quarters was as far removed from a Lucullian depiction by, for instance,

19. Care must be taken to avoid activities which make it "unduly onerous, by reason of delay or otherwise, to seek judicial review * * *." Freedman v. State of Maryland, 380 U.S. 51, 58, 85 S.Ct. 734, 738, 13 L.Ed.2d 649 (1965).

20. It is interesting to note that the record indicates that Janus suffered none of the economic burdens which militate in favor of expediting the treatment of motion picture films. See note 13, supra. Janus' sole interest in the film is as a distributor (it has contributed no funds to the cost of its production) and it does not intend to solicit any orders for the film in this country until it is approved. Moreover, it has no financial commitment to the exporter-producer until the film is licensed for distribution here. Also, there is little reason to believe that the film depreciated in value while it was detained by customs. It was relatively unknown here until this litigation began and the book from which the screenplay was made was published and sold in the United States this year.

21. On June 7, 1965, Janus made a motion for summary judgment on the grounds that (a) "491" was not obscene as a matter of law; (b) that Section 305 was unconstitutional on its face and (c) that Section 305 had been unconstitutionally applied to its activities. The motion was denied by Judge Edward C. McLean in an opinion dated August 5, 1965 and reported at 248 F.Supp. 373.

Cecil B. De Mille, as the North Pole is from the South.

Though the theme of the film is patently offensive to me and some of the shots would surely be beyond the limits of permissible candor if standards today were the standards of the less sophisticated era and area into which I was born and wherein I was reared, I agree that it cannot now be said that the standards of taste we would like are the standards of taste under which we now live. And I agree that it is better to test the liveability of standards in a marketplace of standards than to impose upon all of us tastes which may not be challenged by other rival tastes.

Lastly, and I contribute this bit with real regret, the film cannot truthfully be said to be utterly without redeeming social importance. It attacks broadside the Christian ethos, it exemplifies the worthlessness of humans devoid of innate spiritual resources, it ironically exposes the namby-pamby. Is it not socially important to have one's notions of the good, the pure, and the beautiful subjected to analyses even if the analyses are in poor taste, objectionably set forth, and Karate-administered?

LUMBARD, Chief Judge (dissenting):

I dissent and vote to affirm the judgment of the district court which held that the motion picture "491" is obscene within the meaning of Section 305 of the Tariff Act of 1930, 19 U.S.C. § 1305 and that the customs officials acted properly in deciding to destroy the film.

The strongest evidence in support of its obscenity is the picture itself. Judge Waterman, Judge Moore and I had the distasteful experience of watching this film through its run of 110 minutes. No one would recognize the picture from Judge Moore's opinion as he omits any synopsis of what the cameras show.

What the picture is about is fairly summarized in Judge Graven's thoughtful and balanced opinion from which I quote, 247 F.Supp. 465:

"The film has to do with several youthful delinquents who had been in difficulty with the law. Krister, a bachelor, had a very good and well-furnished home and made it available for a social agency to make use of for the housing of the boys under the supervision of that agency. Not long after the boys move into the house a clergyman calls with a tape recorder. On the tape recorder he played a recording based upon the Gospel according to St. Matthew (18:21–22):

'Then came Peter to him, and said, Lord, how oft shall my brother sin against me, and I forgive him? till seven times?

'Jesus saith unto him, I say not unto thee, Until seven times: but, Until seventy times seven.'

The boys manifested boredom and disinterestedness during the playing of the recording. The theme suggested by the recording was that while 490 sins could be forgiven the 491st sin would constitute an unforgivable sin. The title of the film, '491,' refers to that sin.

"The boys indulge in acts of sadism. One boy cuts a piece out of his hand. Another boy holds his hand over the fire in a fireplace until it is charred.

"The social worker who had supervision of the boys was referred to as the Inspector. It developed that the Inspector was a homosexual. He had one of the boys come to his private office. He then engaged in what a witness described as homosexual love-making which consisted of stroking and fondling of the boy. The Inspector is shown with his head between the thighs of the boy. The movie stops just short of showing the culmination of the homosexual act, but all of the witnesses who testified as to that happening testified that the matter of the culmination of the homosexual act was not left merely as a matter of speculation.

"The boys proceeded to steal and pawn furniture and books belonging to Krister. Supplied with money from doing so, they proceeded to a pier where a freight ship was docked. The crew had a drinking party and sex orgy under way. The boys purchased a large supply of liquor from a member of the crew and joined the affair. A naked prostitute is the subject of the sex orgy. She is shown leaning over the rail in a naked condition while a member of the crew commits sodomy with her. Later she gets dressed and leaves with the boys. In the meantime Krister has discovered the theft of his property which had been pawned. He insisted that the property had to be redeemed. With his acquiescence the boys proceeded to solicit and secure sufficient customers for the prostitute to raise the amount required. Thereafter the boys and the prostitute return to Krister's house where they engage in a sex orgy with her in connection with which there is much exposure of her person and obscene talk. The boys then got angry with her and vented their anger by holding her and forcing a large dog they had picked up into position to have sexual relations with her. The movie stops just short of showing the culmination of sexual relations, but all of the witnesses who testified as to that happening testified that the culmination of the sexual relations was not left as a matter of mere speculation. Thereafter the prostitute passed out of the picture.

"There is next portrayed the boys and Krister together. One of the boys has gone out and called the police. The police informed Krister that the boy had made grave charges against him. The movie ends with the boy who had informed committing suicide by jumping out of a window to the street a considerable distance below."

From this I conclude, as did Judge Graven, that its dominant theme appeals to prurient interest, that it is patently offensive and that it is utterly without redeeming social value. The scenes of sexual gratification follow one another in such close succession, so much time is given to their development and they are so explicit that it seems to me that the district court correctly concluded that the dominant theme was an appeal to prurient interest. One remembers the film for this; it is for this that it will be advertised in one way or another; and it is this feature which will be discussed by those who have seen it and which will be mentioned to those who have not seen it.

That the film is patently offensive no one can deny. Indeed, this is the one point on which all the witnesses, including the judicial witnesses, seem agreed.

That "491" is utterly without redeeming social value is Judge Graven's conclusion. I think it is sound. Nor do the opinions of the experts whose business it is to find "sermons in stones and good in everything," Shakespeare, "As You Like It," 2:1:17 (Cam. ed. 1959), count for much on this point. What "redeeming social value" lies in depicting how evil a group of delinquent adolescents and somewhat more senior males can be, left to their own devices, without any discipline, and tempted by exhibitions of various forms of sexual experience and gratification? Would anyone seriously urge any other person to see this picture on the ground that it added some dimension to an understanding of juvenile delinquency or the operations of governmental agencies? Of course not. The story, such as it is, proceeds from bad to worse and from worse to worst. The only character who seemed at all possible of redemption is driven to suicide. Everyone is involved to some degree in the orgies and the lawbreaking which the film portrays.

Judge Moore prefers to rely on the sociological, journalistic and artistic interpretations of the "experts" called by the claimant, instead of considering the impact of the film. It would seem obvious that any expert of such nature would hardly be representative of the members of the public who would pay their mon-

ey not in the hope of being educated and uplifted regarding problems of juvenile delinquency but in search of entertainment and titillation. One does not need the assistance of a public opinion survey to conclude that the percentage of the American public which would see "491" and remember it as a lesson in sociology or in the problems of juvenile delinquency or as an artistic production would be some small fraction of one per cent.

We should not forget as we set down our views in black and white that the impact of a 110-minute motion picture is far greater and more lasting than any amount of print. So it is with a picture such as "491." Much more can be suggested by motion pictures; it is not always necessary to show the ultimate consequences of each scene. With the actors in motion and the means of gratification clearly indicated and at hand there is little if anything required of the viewer's imagination. The stimulation of prurient interest is greatly heightened by sharing the experience of seeing such a film. Moreover, for the viewer caught unaware, there is no effective way to limit the offensive impact of scenes cast on the screen before him. The prurient appeal and offensiveness, which is only a possibility with printed words becomes almost a certainty with a motion picture.

I would suppose that if the customs law had any meaning or purpose it would be to enable the government to deny to anyone the right to import a motion picture such as "491" into this country.

I concur with so much of Judge Moore's opinion as treats of other matters.

It may be appropriate to add that the decision of this court is not binding on any state. The propriety of any state action may well rest in part on factors not present here such as the manner in which the film is touted and advertised by those who will exploit it for gain. See Ginzburg v. United States, 383 U.S. 463, 470–476, 86 S.Ct. 969, 16 L.Ed.2d 31 (1966).