## MUSSER ET AL. *v.* UTAH.

No. 60.   Argued November 10, 1947.—Reargued January 5, 1948.—
Decided February 9, 1948.

*Claude T. Barnes* argued the cause and filed a brief for appellants.

*Calvin L. Rampton* and *Zar E. Hayes,* Assistant Attorneys General of Utah, argued the cause for appellee on the original argument, and *Mr. Rampton* on the reargument.   With them on the brief was *Grover A. Giles,* Attorney General.

*Arthur Garfield Hays* and *Osmond K. Fraenkel* filed a brief for the American Civil Liberties Union, as *amicus curiae,* urging reversal.

Mr. Justice Jackson delivered the opinion of the Court.

The appellants sought review by this Court of a decision by the Supreme Court of Utah on the ground that the State convicted them in violation of the Fourteenth

Amendment to the Federal Constitution. In the trial court a motion to dismiss the charge at the close of the evidence broadly indicated reliance on the Fourteenth as well as the First Amendment, and such reliance was indicated in requests for instructions. A preliminary motion to quash the information was stated in broad terms which it is claimed admitted argument of any federal grounds. Trial resulted in conviction and the Supreme Court of the State overruled all constitutional objections and affirmed.

On argument in this Court, inquiries from the bench suggested a federal question which had not been specifically assigned by defendants in this Court, nor in any court below, although general transgression of the Fourteenth Amendment had been alleged. This question is whether the Utah statute, for violation of which the appellants are amerced, is so vague and indefinite that it fails adequately to define the offense or to give reasonable standards for determining guilt. The question grew out of these circumstances:

Defendants were tried on an information which charged violation of § 103–11–1, Utah Code Ann. 1943, in that they conspired "to commit acts injurious to public morals as follows, to-wit: . . . ." It then specified acts which amount briefly to conspiring to counsel, advise, and practice polygamous or plural marriage, and it set forth a series of overt acts in furtherance thereof. The Supreme Court considered that the prosecution was under Paragraph (5) of 103–11–1 which, so far as relevant, defines conspiracy, "(5) to commit any act injurious to the public health, to public morals, or to trade or commerce, or for the perversion or obstruction of justice or the due administration of the laws . . . ."

It is obvious that this is no narrowly drawn statute. We do not presume to give an interpretation as to what

it may include. Standing by itself, it would seem to be warrant for conviction for agreement to do almost any act which a judge and jury might find at the moment contrary to his or its notions of what was good for health, morals, trade, commerce, justice or order. In some States the phrase "injurious to public morals" would be likely to punish acts which it would not punish in others because of the varying policies on such matters as use of cigarettes or liquor and the permissibility of gambling. This led to the inquiry as to whether the statute attempts to cover so much that it effectively covers nothing. Statutes defining crimes may fail of their purpose if they do not provide some reasonable standards of guilt. See, for example, *United States* v. *Cohen Grocery Co.,* 255 U. S. 81. Legislation may run afoul of the Due Process Clause because it fails to give adequate guidance to those who would be law-abiding, to advise defendants of the nature of the offense with which they are charged, or to guide courts in trying those who are accused.

When the adequacy of this statute in these respects was questioned, the State asked and was granted reargument here. Rehearing convinces us that questions are inherent in this appeal which were not presented to or considered by the Utah Supreme Court and which involve determination of state law. We recognize that the part of the statute we have quoted does not stand by itself as the law of Utah but is part of the whole body of common and statute law of that State and is to be judged in that context. It is argued that while Paragraph (5) as quoted is admittedly very general, the present charge is sustainable under Paragraph (1) thereof which makes a crime of any conspiracy to commit a crime and that the sweep of Paragraph (5) is or may be so limited by its context or by judicial construction as to supply more definite standards for determining guilt. It is also said that the point, so far

as this case is concerned, has been waived or lost because there was no timely or sufficient assignment of it as ground for dismissal to comply with state practice. We believe we should not pass upon the questions raised here until the Supreme Court of Utah has had opportunity to deal with this ultimate issue of federal law and with any state law questions relevant to it.

This trial was not conducted in federal court nor for violation of federal law. It is a prosecution by the State, in its courts, to vindicate its own laws. Our sole concern with it is to see that no conviction contrary to a valid objection raised under the Fourteenth Amendment is upheld. What the statutes of a State mean, the extent to which any provision may be limited by other Acts or by other parts of the same Act, are questions on which the highest court of the State has the final word. The right to speak this word is one which State courts should jealously maintain and which we should scrupulously observe. In order that the controversy may be restored to the control of the Supreme Court of Utah, its present judgment is vacated and the cause is remanded for proceedings not inconsistent herewith.

*Vacated and remanded.*

Mr. Justice Black concurs in the result.

Mr. Justice Rutledge, with whom Mr. Justice Douglas and Mr. Justice Murphy concur, dissenting.

I would make a different disposition of the case. I think a deeper vice infects these convictions than their apparent invalidity for vagueness of the Utah statute, first suggested on the original argument here, even if further construction by the Utah courts might possibly remove that ground for reversal. The crucial question, which the case was brought to this Court to review, is

whether the state supreme court has construed the Utah statute to authorize punishment for exercising the right of free speech protected by the First and Fourteenth Amendments to the Federal Constitution.

The statute which appellants have violated provides that it shall be a crime for two or more persons to conspire "to commit any act injurious . . . to public morals." The opinion of the state supreme court construes these words to apply to conduct which induces people to enter into bigamous relationships and, more particularly, to the advocacy of the practice of polygamy. It held that the appellants were properly convicted because the evidence proved that they were parties to "an agreement to advocate, counsel, advise and urge the practice of polygamy and unlawful cohabitation by other persons."

Although the entire record of the trial has not been brought here, it is clear that some appellants urged certain particular individuals to practice polygamy.[1] For present purposes I assume that such direct and personalized activity amounting to incitation to commit a crime may be proscribed by the state. However the charge was not restricted to a claim that appellants had conspired to urge particular violations of the law. Instead, the information as construed by the state court broadly condemned the conspiracy to advocate and urge the practice of polygamy.[2] This advocacy was at least in part conducted in religious meetings where, although pressure may also have been applied to individuals, considerable general discussion of

[1] "At one of these meetings, one Heber C. Smith, Jr. was made the specific object of remarks of various defendants." 110 Utah 533, 554, 175 P. 2d 724, 735.

[2] Although the information in terms charged a conspiracy to advocate *and* practice polygamy, the state court construed it as though it charged a conspiracy to advocate *the practice of* polygamy. 110 Utah 533, 544–545, 175 P. 2d 724, 730.

the religious duty to enter into plural marriages was carried on.[3]

Neither the statute, the information, nor the portions of the charge to the jury which are preserved in the printed record distinguish between the specific incitations and the more generalized discussions. Cf. *Thomas* v. *Collins,* 323 U. S. 516. Thus the trial and convictions proceeded on the theory that the statute applied indiscriminately to both types of activity. This is made doubly clear by the fact that the state supreme court set aside the convictions of several defendants who had done no more than attend meetings, give opinions on religious subjects and criticize legislation.[4] By setting aside these convictions that court indicated that it did not consider every discussion of polygamy, or attendance at meetings where the practice is advocated, to be "an act injurious to the public morals." Such a limitation on the scope of the statute was unquestionably required

---

[3] "It is true . . . that at certain meetings speakers discussed polygamy, reading from the Bible and making the claim that the ancient polygamous marriage system was instituted of God, and that 'plural marriage is a law of God'; that some individuals at these meetings declared that legislation prohibiting the practice of polygamy violates the spirit of the First Amendment to the Federal Constitution; that some speakers denounced officials of the Mormon Church for excommunication of people for teaching or practicing plural marriage, stating that the leaders of said church have 'no divine authority' and that such church is apostate; and that some services were conducted as 'testimonial meetings' at which members of the congregation arose voluntarily to express their views on any subject, and to acknowledge gratitude to God." 110 Utah 533, 551–552, 175 P. 2d 724, 734.

[4] "If it were true that none of the defendants did anything other than to attend meetings as indicated above [see note 3 *supra*], expressing disagreement with some other denomination, criticizing legislation, and giving opinions on religious subjects, none of the convictions could be upheld. The right of free speech cannot be curtailed by indirection through a charge of criminal conspiracy." 110 Utah 533, 552, 175 P. 2d 724, 734.

by the Federal Constitution. But as I read the opinion of the state court, it did not make a further limitation also required by the First and Fourteenth Amendments. The Utah statute was construed to proscribe any agreement to advocate the practice of polygamy.[5] Thus the line was drawn between discussion and advocacy.

The Constitution requires that the statute be limited more narrowly. At the very least the line must be drawn between advocacy and incitement, and even the state's power to punish incitement may vary with the nature of the speech, whether persuasive or coercive, the nature of the wrong induced, whether violent or merely offensive to the mores, and the degree of probability that the substantive evil actually will result. See *Bridges* v. *California,* 314 U. S. 252, 262–263.

It is axiomatic that a democratic state may not deny its citizens the right to criticize existing laws and to urge that they be changed. And yet, in order to succeed in an effort to legalize polygamy it is obviously necessary to convince a substantial number of people that such conduct is desirable. But conviction that the practice is desirable has a natural tendency to induce the practice itself.[6] Thus, depending on where the circular reasoning

---

[5] The court held "that an agreement to advocate, teach, counsel, advise and urge other persons to practice polygamy and unlawful cohabitation, is an agreement to commit *acts* injurious to public morals within the scope of the conspiracy statute." 110 Utah 533, 546–547, 175 P. 2d 724, 731.

[6] "Political agitation, by the passions it arouses or the convictions it engenders, may in fact stimulate men to the violation of law. Detestation of existing policies is easily transformed into forcible resistance of the authority which puts them in execution, and it would be folly to disregard the causal relation between the two. Yet to assimilate agitation, legitimate as such, with direct incitement to violent resistance, is to disregard the tolerance of all methods of political agitation which in normal times is a safeguard of free government. The distinction is not a scholastic subterfuge, but a hard-bought acquisition in the fight for freedom, and the purpose to disregard it

is started, the advocacy of polygamy may either be unlawful as inducing a violation of law, or be constitutionally protected as essential to the proper functioning of the democratic process.

In the abstract the problem could be solved in various ways. At one extreme it could be said that society can best protect itself by prohibiting only the substantive evil and relying on a completely free interchange of ideas as the best safeguard against demoralizing propaganda.[7] Or we might permit advocacy of lawbreaking, but only so long as the advocacy falls short of incitement.[8] But the other extreme position, that the state may prevent any conduct which induces people to violate the law, or any advocacy of unlawful activity, cannot be squared with the First Amendment. At the very least, as we have indicated, under the clear-and-present-danger rule, the second alternative stated marks the limit of the state's power as restricted by the Amendment.

The Supreme Court of Utah has in effect adopted the third position stated above. It affirmed the convictions

---

must be evident when the power exists. If one stops short of urging upon others that it is their duty or their interest to resist the law, it seems to me one should not be held to have attempted to cause its violation." Judge Learned Hand in *Masses Pub. Co.* v. *Patten,* 244 F. 535, 540.

[7] "We have nothing to fear from the demoralizing reasonings of some, if others are left free to demonstrate their errors and especially when the law stands ready to punish the first criminal act produced by the false reasonings; these are safer corrections than the conscience of a judge." Excerpt from letter written by Thomas Jefferson to Elijah Boardman of New Milford, Connecticut, on July 3, 1801, quoted by Charles A. Beard, The Nation, July 7, 1926, vol. 123, p. 8.

[8] "But even advocacy of violation, however reprehensible morally, is not a justification for denying free speech where the advocacy falls short of incitement and there is nothing to indicate that the advocacy would be immediately acted on." Mr. Justice Brandeis, concurring in *Whitney* v. *California,* 274 U. S. at 376.

on the theory that an agreement to advocate polygamy is unlawful. The trial court certainly proceeded on this theory, if it did not go further and consider discussion of polygamy as injurious to public morals as well. Therefore, even assuming that appellants may have been guilty of conduct which the state may properly restrain, the convictions should be set aside. A general verdict was returned, and hence it is impossible to determine whether the jury convicted appellants on the ground that they conspired merely to advocate polygamy or on the ground that the conspiracy was intended to incite particular and immediate violations of the law. Since therefore the convictions may rest on a ground invalid under the Federal Constitution, I would reverse the judgment of the state court. Cf. *Thomas* v. *Collins, supra; Williams* v. *North Carolina,* 317 U. S. 287; *Stromberg* v. *California,* 283 U. S. 359.