**P. B. I. C., INC., Natoma Productions, Inc., Frank Butler, Marjorie Dunaway, Jory Richardson, Brooke Lappin, Morton L. Leavy, Donald Francis Tirabassi, and Marlena Langston, Plaintiffs,**

**v.**

**Garrett H. BYRNE, Defendant.**

**Civ. A. No. 70–508–G.**

United States District Court,
D. Massachusetts.

May 6, 1970.

Stay Denied May 22, 1970.

See 90 S.Ct. 1718.

Gerald A. Berlin, Harold Katz, Henry Monaghan, Boston, Mass., for plaintiffs.

Joseph Nolan, Asst. Dist. Atty., Lawrence Cohen, Asst. Atty. Gen., Boston, Mass., for defendant.

Before COFFIN, Circuit Judge, and GARRITY and BOWNES, District Judges.

## OPINION OF THE COURT

COFFIN, Circuit Judge.

On February 22, 1970, the live theater production "Hair" opened at the Wilbur Theater in Boston, Massachusetts for an indefinite run. A few days later, the District Attorney of Suffolk County advised various persons responsible for

and engaged in the Boston production that the performers and the producers would be prosecuted under sections 16 [1] and 32 [2] of Chapter 272 of the Massachusetts General Laws if certain conduct occurring in the play was not discontinued. Plaintiffs [3] immediately sought injunctive and declaratory relief from a single Justice of the Massachusetts Supreme Judicial Court. Hearing was promptly held, at which time evidence was taken which included the script of "Hair", the favorable testimony of two drama critics concerning the importance and artistic merit of the play, and three generally non-condemnatory reports of a police officer who had observed both the New York and Boston productions. The case was reserved to the full court.

The court's decision was rendered on April 9 1970, after each participating Justice had observed the Boston production as a member of the regular nightly audience. Their decision, set forth in toto in the appendix to our opinion, decreed that injunctive relief against prosecution under the aforementioned statutory provisions would only be ordered if certain portions of the play were modified or excised.[4] The rationale for such decision seems to have been that the acts in question were "lewd and lascivious" and that persons who perform such acts are not entitled to equitable relief under Massachusetts law, notwithstanding the fact that such acts are performed as a part of a play which is not otherwise "lewd and lascivious", let alone constitu-

1. Mass.Gen.Laws Ann. c. 272 § 16
"A man and woman who, not being married to each other, lewdly and lasciviously associate and cohabit together, or a man or woman, married or unmarried, who is guilty of open and gross lewdness and lascivious behavior, shall be punished by imprisonment in the state prison for not more than three years or in jail for not more than two years or by a fine of not more than three hundred dollars."

2. Mass.Gen.Laws Ann. c. 272 § 32 (Supp. 1969)
"Whoever, as owner, manager, director, agent or in any other capacity, prepares, advertises, gives, presents or participates in any lewd, obscene, indecent, immoral or impure show or entertainment, or in any show or entertainment suggestive of lewdness, obscenity, indecency, immorality or impurity, or in any show or entertainment manifestly tending to corrupt the morals of youth, shall be punished by imprisonment for not more than two years or by a fine of not more than five thousand dollars, or both. The provisions of this section shall not apply to a motion picture operator, or assistant operator, licensed under sections seventy-five and seventy-six of chapter one hundred and forty-three, respectively, who is employed in a motion picture theatre licensed under section one hundred and eighty-one of chapter one hundred and forty and section thirty-four of chapter one hundred and forty-three, in connection with a motion picture show exhibited in said theatre, provided that such operator, or assistant operator, has no financial interest in the motion picture theatre wherein he is so employed."

3. P.B.I.C., Inc., and Natoma Productions, Inc., both corporations duly organized under the laws of the State of Illinois, Frank Butler, Jory Richardson, Marjorie Dunaway, Brooke Lappin, and Morton L. Leavy, are all partners associated in a limited partnership operating under the name and style of "The New Hair Company", of which Natoma Productions, Inc., is the general partner. Plaintiff Donald Francis Tirabassi is presently employed by the above partnership and is acting as assistant manager of the musical stage production "Hair". Plaintiff Marlena Langston is a member of the cast of "Hair"; she sues on behalf of herself and all members of the cast.

4. Specifically, the injunctive relief was "conditioned upon excision forthwith of the specified lewd features so as (a) to have each member of the cast clothed to a reasonable extent at all times, and (b) to eliminate completely all simulation of sexual intercourse or deviation."
The "specified lewd features" referred to two scenes involving nudity and "incidental stage action which a jury could conclude was clowning intended to simulate sexual intercourse or deviation." The District Attorney has interpreted this as a mandate to prosecute if any one of seven specific scenes is played.

tionally "obscene". Plaintiffs' Motion for Clarification of the court's opinion was denied without comment by the court on the same day. On April 10, 1970, the cast and producers chose to close the show rather than make the modifications indicated· by the court's opinion or risk criminal prosecution by continuing to present the production without modification.

On April 13, the plaintiffs filed suit in the federal district court, seeking injunctive relief pursuant to 42 U.S.C. § 1983 against the promised state prosecution by defendant District Attorney of Suffolk County if the play continues unexpurgated, and a declaratory judgment pursuant to 28 U.S.C. § 2201 that the statutes herein involved are unconstitutional on their face or as applied. Pursuant to 28 U.S.C. § 2281 et seq., this three-judge court was convened to consider the issues presented by plaintiffs' suit. We find, on the basis of our discussion *infra,* that we have jurisdiction because of the substantial federal question here presented. 28 U.S.C. §§ 1331, 1343(3).

The hearing before us revealed, inter alia, that the defendant promises to prosecute if the show reopens without meeting the conditions in the Supreme Judicial Court's opinion; he will not limit himself to one test case and can give no assurance as to the number of prosecutions. Of critical importance, however, defendant now assures us that the promised prosecutions will not be founded on section 32 but rather on section 16 and the common law of indecent exposure. For their part, the performers do not wish to risk repeated fines and jail sentences, nor do they wish to make the required alterations, for they view their so doing as compromising the integrity of the production. In the

meantime,. the production is losing weekly box office gross receipts of about $70,-000, is making refunds or exchanges for tickets already sold, and is no longer making advance sales. They had anticipated a lengthy run in Boston, having at the time of filing this suit advance ticket sales of approximately $600,000.

We are urged not to proceed to the merits of this dispute on the grounds that such consideration is prevented by the principles of res judicata, the Supreme Judicial Court having already decided the critical issues here presented. We disagree. The only issue clearly resolved by the court involved the availability of injunctive relief under Massachusetts law; any finding with regard to the severability of the acts in question relates only to the practical feasibility of the relief ordered. We admit to considerable uncertainty whether the court also determined that section 16 applies to live theater productions and should be interpreted to proscribe "lewd and lascivious" acts performed in such productions. Suffice it to say that there is no indication whatever that the Supreme Judicial Court held that section 16 is constitutional as applied to live theater productions. We therefore are not barred by res judicata from considering that question.[5]

### The Constitutional Issue

This brings us to a consideration of the basic constitutional issue presented by plaintiffs' request for declaratory relief: whether a "lewd and lascivious" statute and the common law crime of indecent exposure may be used as weapons to root out of a live theater production some allegedly objectionable conduct. We begin with the proposition that live theater productions, like

5. Indeed, the opinion reflects the fact that constitutional issues were briefed and argued to the extent of asserting "reasonable doubts" as to the applicability of section 16 and its constitutionality if applicable. To draw the inference that the court, in the light of this background, ruled on either point by implication is, to our mind, less reasonable than that it merely did what it said it did, i. e., required the plaintiffs to wash their hands before invoking the office of the Chancellor. We feel no *compulsion* to read into this opinion the adjudication of an important constitutional question.

movies,[6] are within the ambit of protection of the First Amendment. People v. Bercowitz, 308 N.Y.S.2d 1 (N.Y.C. Crim.Ct., Feb. 25, 1970); Barrows v. Municipal Court of Los Angeles Jud. Dist., 1 Cal.3d 821, 83 Cal.Rptr. 819, 821, 464 P.2d 483 (1970); Dixon v. Municipal Court of City & County of San Francisco, 267 Cal.App.2d 789, 73 Cal. Rptr. 587, 589 (1968). That the Supreme Court has not recently had occasion to so hold cannot alter the unassailable fact that the stage has been a traditional and important medium for the presentation and expression of ideas. Our problem is to determine the extent of the protection afforded by the First Amendment. Roth v. United States, 354 U.S. 476, 481–485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957), established the basic doctrine that "obscenity is not within the area of constitutionally protected speech or press", but that which falls short of it is.[7] The years since *Roth* have witnessed sporadic efforts to obtain a consensus on what is "obscene". [8]

More recently, however, the Court has held that the mere private possession of obscene matter cannot constitutionally be made a crime, Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), thus establishing—contrary to *Roth*—that obscenity in some contexts *is* protected by the First Amendment. A three-judge court in Karalexis v. Byrne, 306 F.Supp. 1363 (D.Mass.1969) (Julian, J. dissenting), *temporary injunction stayed pending disposition of appeal,* 396 U.S. 976, 90 S.Ct. 469, 24 L.Ed.2d 447, 486 (1969), *prob. juris. noted,* 397 U.S.

985, 90 S.Ct. 1123, 25 L.Ed.2d 394 (March 23, 1970), read *Stanley* to suggest that a state may not proscribe "obscenity" in a movie theater, if the public is forewarned of the character of the presentation in a manner which does not constitute pandering, if adolescents are excluded, and if such obscene presentation does not generate a clear and present danger of illegal anti-social conduct.

■ Plaintiffs argue that *Karalexis* applies a fortiori to our case. However, adolescents were not excluded here; rather, persons who inquired concerning the admissibility of minors were advised to acquaint themselves with the play's content and nature before bringing the child. Secondly, plaintiff's "a fortiori" argument relies on the premise that movies and live plays are indistinguishable for purpose of the "obscenity" issues presented here, which premise we do not feel compelled to accept as a matter of law. The impact on the theater patron may well differ depending on whether the acts being viewed are presented on a film screen or are performed or simulated by live persons a few rows in front of him. The immediacy of the live theater, its easy access to the audience, its newly rediscovered capacity for improvisation, and its consequent unpredictability even to an adult and sophisticated play-goer distinguish it from a film production where the possibilities of sexual exhortation and of giving offense are fixed in celluloid.

■ We therefore resist the temptation to treat *Karalexis* as dispositive of

---

6. Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952); Kingsley Pictures Corp. v. Regents, 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959); Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964); Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); Interstate Circuit, Inc. v. City of Dallas, 390 U.S. 676, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968).

7. It has been settled that a state may regulate the distribution or presentation of offensive material to adolescents even

though such material may fall short of being "obscene". Ginsberg v. New York, 390 U.S. 629, 634–643, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). However, it is equally well settled that a state may not confine its adult population to only those books, movies, and plays which are permissible for adolescent consumption. *E. g.,* Butler v. Michigan, 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957).

8. Interstate Circuit, Inc. v. Dallas, 390 U.S. at 704–707, 88 S.Ct. 1298 (opinion of Harlan, J., collecting prior Court decisions).

the constitutional issues here presented. Rather than attempting ourselves to discern what the *Stanley* decision has to say with regard to live theater productions, we conclude that the instant controversy may be resolved within the post-*Roth*, pre-*Stanley* principle that "obscenity" in a First Amendment context is not protected from state regulation but that which falls short of it is.

The Court's efforts to establish a constitutional definition for "obscenity" have, understandably, failed to generate a doctrinal consensus. However, the commonly applied test involves a three-pronged analysis, most clearly articulated in A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Com. of Massachusetts, 383 U.S. 413, 418, 86 S.Ct. 975, 977, 16 L.Ed.2d 1 (1966):

> "[T]hree elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value."

To this analysis was added a fourth consideration, that in close cases evidence of pandering may be probative with respect to the nature of the material in question, Ginzburg v. United States, 383 U.S. 463, 474, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966).

These enunciations of the relevant constitutional standard were set forth in cases involving printed material. It appears that that same standard also applies to the determination of whether a movie is "obscene",[9] although we agree with the recent decision of the Second Circuit that the application of the test to different media should take account of the differences inherent in those media. United States v. A Motion Picture Film Entitled "I am Curious-Yellow", 404 F.2d 196, 198, 203 (2d Cir. 1968).

We conclude that this same "obscenity" standard also applies to the regulation of live theater productions—*accord*: Barrows v. Municipal Court, *supra*; People v. Bercowitz, *supra*; Dixon v. Municipal Court, *supra*—again with the understanding that the four factors must be assessed in light of the particular impact made by a live theater production. Confining state interference with the live theater to that which is "obscene" reflects the fundamental importance which the First Amendment attaches to the unencumbered expression of ideas. We recognize that our analysis involves a delicate judgment, and

---

9. The question was not reached in Interstate Circuit Inc. v. Dallas, 390 U.S. at 686–687, n. 15, 88 S.Ct. 1298. However, numerous recent lower court decisions have focused on the *Memoirs* analysis in assessing the "obscenity" of a motion picture. *E. g.*, Commonwealth v. State Amusement Corp., 248 N.E.2d 497 (Mass.1969); United States v. One Carton Positive Motion Picture Film Entitled "491", 367 F.2d 889 (2d Cir. 1966); United States v. A Motion Picture Film Entitled "I am Curious-Yellow", 404 F.2d 196, 199, 203 (2d Cir. 1968); Schackman v. Arnebergh, 258 F.Supp. 983, 991–992, 995 (C.D.Cal.1966), appeal dismissed, 387 U.S. 427, 87 S.Ct. 1622, 18 L.Ed.2d 865 (1967), reh'g denied, 389 U.S. 893, 88 S.Ct. 16, 19 L.Ed. 2d 204 (1967); Pinkus v. Arnebergh, 258 F.Supp. 996, 1001, 1002, 1005 (C.D. Cal.1966); Cambist Films, Inc. v. Tribell, 293 F.Supp. 407, 410 (E.D.Ky. 1968); 208 Cinema, Inc. v. Vergari, 298 F.Supp. 1175, 1179 (S.D.N.Y.1969); United States v. A Motion Picture Film Entitled "Pattern of Evil", 304 F.Supp. 197, 201 (S.D.N.Y.1969); United States v. Apple, 305 F.Supp. 330, 331–332 (D. Md.1968), aff'd, 417 F.2d 1070 (4th Cir. 1969); Ratner v. Weddle, 307 F. Supp. 471, 472 (C.D.Cal.1968); McGrew v. City of Jackson, Miss., 307 F.Supp. 754 (S.D.Miss.1969).

The *Memoirs* standards have been applied to protect other forms of entertainment. *E. g.*, Hudson v. United States, 234 A.2d 903 (Dist.Col.App.1967) (burlesque show); In re Giannini, 69 Cal.2d 563, 72 Cal.Rptr. 655, 446 P.2d 535 (1968) ("topless" dance).

that a story may be protected in book form but not in movie form, or in movie form but not in the live theater. An application of the *Memoirs* analysis *without* regard to the obvious differences among the various media could result in all media being confined to the limitations imposed on the medium in which the particular presentation is most offensive. On the other hand, the enunciation of a different standard for every conceivable medium would only compound the confusion without ameliorating the delicacy of the basic judgments required by any standard.

■ Having concluded that the Constitution prevents a state from regulating a live theater production unless it is constitutionally "obscene", we now ask whether either section 16 or the "closely similar"[10] common law crime of indecent exposure can be applied to the live theater without offending that Constitutional limitation.[11] Since we are dealing with a medium protected by the First Amendment, we keep in mind that "precision of regulation must be the touchstone." Interstate Circuit v. Dallas, 390 U.S. at 682, 88 S.Ct. at 1302.

■ The kind of activity obviously within the purview of section 16 is the imposition of lewdness or nudity on an unsuspecting or unwilling person, *e. g.*, Commonwealth v. Dickinson, 348 Mass. 767, 202 N.E.2d 240 (1964), and Commonwealth v. Cummings, 273 Mass. 229, 231, 173 N.E. 506 (1930). The crime of indecent exposure is "offensively exposing [oneself] * * * without necessity or reasonable excuse, and in such a way as to produce alarm," Commonwealth v. Wardell, 128 Mass. 52, 53 (1880); *but see* Commonwealth v. Bishop, 296 Mass. 459, 462, 6 N.E.2d 369, 370 (1937): "It is enough if it be an intentional act of lewd exposure, offensive to one or more persons." These proscriptions obviously apply to a broad range of lewd conduct. *See generally* 94 A.L.R.2d 1348 (1964) (Indecent Exposure). They have not been and *need not be* limited to constitutional "obscenity" when the activity is imposed on the unsuspecting public. To say that the common law crime and the statute apply to all nudity on the stage, however, would ignore both the fact that the audience is willing and forewarned,[12] and such other factors as pose, lighting, angle of audience vision, mobility, and dramatic context. *See* United States v. A Motion Picture Film, 404 F.2d at 199. A dim silhouette of a naked form would be as punishable as the most blatant eroticism. Similarly, the vulnerability to a "lewd and lascivious behavior" statute of all simulations of sexual deviation would be equally indiscriminate, barring even the muted portrayal of a deviate when such might be essential to a drama. We cannot escape the conclusion that to apply the standards of the street and marketplace to the world behind the

10. Commonwealth v. Broadland, 315 Mass. 20, 22, 51 N.E.2d 961 (1943). More recently, the Supreme Judicial Court relied in part on a case involving a conviction for the common law offense to sustain a conviction for a violation of section 16, indicating the interchangeability with which the Supreme Judicial Court views the two offenses. Commonwealth v. Dickinson, 348 Mass. 767, 202 N.E.2d 240 (1964).

11. The fact that all fifty states have statutes similar and often identical to section 16, and that these have almost entirely escaped challenge loses force when we are told that they have not been applied to theatrical performances. *See specifically* Barrows v. Municipal Court of Los Angeles, *supra*. The ancestor of section 16 was first enacted in 1784 and, so far as we know, has not until now been used to police a dramatic performance.

12. In overturning three lower court determinations of "obscenity", the Court in Redrup v. New York, 386 U.S. 767, 769, 87 S.Ct. 1414, 1415, 18 L.Ed.2d 515 (1967), attached significance to the fact that

"In none [of the three cases] was there any suggestion of an assault upon individual privacy by publication in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it."

footlights would be to sanction a censorship dragnet of unconstitutional proportions.[13]

This problem was recognized by the California Supreme Court in construing a "lewd and dissolute" conduct statute as inapplicable to live theater:

"acts which are unlawful in a different context, circumstance, or place, may be depicted or incorporated in a stage or screen presentation and come within the protection of the First Amendment, losing that protection only if found to be obscene." [14]

Nor could the promised prosecution of live theater under section 16 and the crime of indecent exposure pass constitutional muster by envisaging a double standard for those provisions, i. e., proscribing a broad range of public nudity when applied outside the First Amendment context and at the same time making operative the much narrower "obscenity" proscription of conduct performed in the theater. If Massachusetts were allowed to attribute such distinctly different interpretations to the same words in the same statute, there would be little sense in having the statute at all. This, however, is precisely what our dissenting brother anticipates—that the Massachusetts courts would take into account the dramatic context to determine whether there is a "necessary or reasonable excuse" for an incident which would otherwise be "lewd, lascivious" behaviour. The short answer is that such interpretation would still allow the state to interfere with non-obscene presenta-

tions, contrary to *Roth* and its progeny. Moreover, the present judgments which courts are called upon to make in applying the "obscenity" principle to works of artistic expression are difficult enough without conditioning criminal convictions on further judgments by courts as to dramatic relevance. Were culpability to depend on a defendant's ability to convince a court that there was a "reasonable excuse" for every scene which might be questioned, the chilling effect on theater generally would be of ice age proportions. We conclude that Massachusetts' "lewd and lascivious" proscription cannot be given a constitutionally permissible interpretation in the live theater context while retaining its much broader proscription for non-speech forms of lewd conduct, without running afoul of the constitutional requirement that limitations on speech-related activities must be narrowly drawn so as not to chill legitimate expression. Zwickler v. Koota, 389 U.S. 241, 250, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), and cases cited.

■■■■■■ Lest we be understood as saying that a state is helpless to protect itself against obscene portions of a live theater production, we point out that pandering can provide a basis for state intervention and that the admission of minors can be regulated. Beyond that, isolated acts in a play may be so dominant or offensive as to pervade or distort the production as a whole, thereby bringing the play within the state's power to proscribe "obscenity," as was held in *Bercowitz, supra.*[15] In such a case,

13. Our concern can be illustrated by section 53 of Chapter 272 of the Massachusetts General Laws, which, inter alia, prohibits lewd, wanton and lascivious speech or behavior. Defendant promises not to prosecute under this section, although he suspects that the first act of "Hair" contains much that is indictable under it. He does not fear "the application of free speech tests", but he believes—sensibly, we might add—that rational communication can survive resort to epithet and invective. Legally, however, "Hair" and not a few other plays are, on this theory, subject to being closed down if the offending language is

not excised. *See also* section 36 of Chapter 272, surely of dubious constitutionality if applied to the live theater.

14. In re Giannini, 72 Cal.Rptr. at 661, followed in Barrows v. Municipal Court, 83 Cal.Rptr. at 825.

15. While discussing *Bercowitz,* our dissenting brother attaches significance to the fact that the performers there were found guilty of violating a "lewdness" statute similar to section 16. However, such finding was made, without discussion, only after the court had concluded that the play as a whole was obscene

however, the offensive portions would not be viewed in isolation—as section 16 would permit—but only as part of the production as a whole, in accordance with the prevailing "obscenity" standards.

### Injunctive Relief

Since section 16 and the common law of indecent exposure employ "means which sweep unnecessarily broadly and thereby invade the area of protected freedoms," NAACP v. Alabama, 377 U.S. 288, 307, 84 S.Ct. 1302, 1314, 12 L.Ed.2d 325 (1964), abstention would be inappropriate. Zwickler v. Koota, *supra*; Dombrowski v. Pfister, 380 U.S. 479, 489–490, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). The more difficult question is whether plaintiffs have shown those "special circumstances" which justify federal interference with a state's good faith enforcement of its criminal laws. Dombrowski v. Pfister, *supra*; Douglas v. City of Jeannette, 319 U.S. 157, 63 S. Ct. 877, 87 L.Ed. 1324 (1943).[16] We recognize that comity restrains the exercise of federal equitable power, Dombrowski v. Pfister, *supra* 380 U.S. at 484, 85 S.Ct. 1116, and that injunctive relief should be granted only on a showing of harm "both great and immediate," Douglas v. City of Jeannette, *supra* 319 U.S. at 164, 63 S.Ct. at 881, but we conclude that the requisite showing has been made in this case.

Two factors influence our decision. First, the District Attorney has declared that he feels duty bound to prosecute if and when "Hair" is presented without making the deletions indicated by the

Massachusetts court. *See* n. 4. Thus we cannot reasonably expect a single test case to settle the contours of the law. Compare Beale v. Missouri Pacific RR, 312 U.S. 45, 61 S.Ct. 418, 85 L.Ed. 577 (1941). On the contrary, each night's performance will offer the District Attorney new opportunities to carry out his declared intent. Moreover, there are a variety of conceivably lewd scenes in this play, some solemn, some bumptious, some open, some covert. To date, the District Attorney has identified seven acts which in his mind violate the statute. Acquittal for participation in one of these acts does not bar prosecution for different conduct in another scene. We may therefore expect multiple prosecutions against members of the cast. *See* Byrne v. Karalexis, 396 U.S. 976, 983, 90 S.Ct. 469, 24 L.Ed.2d 447, 486 (1969) (Opinion of Stewart, J.).

In light of the uncertain implications of the Supreme Judicial Court's opinion as the District Attorney might interpret it, the threat of multiple prosecutions alone might justify federal intervention to vindicate constitutional rights. *Cf.* Ex parte Young, 209 U.S. 123, 147, 28 S.Ct. 441, 52 L.Ed. 714 (1908); Oklahoma Operating Co. v. Love, 252 U.S. 331, 336–337, 40 S.Ct. 338, 64 L.Ed. 596 (1920). In our case we have an additional factor, a chilling effect on the First Amendment right of plaintiffs, others engaged in the theater in Massachusetts, and the theater going public in the New England area. The actors in "Hair" must face either sentences of up to three years for sex offenses or, if the show closes, loss of their livelihood. Plaintiffs' dilemma cannot fail to influence other actors and producers, espe-

---

and thus unprotected. Whatever may be said for the view that "lewdness" statutes can be applied to live theater productions which are first judged "obscene" as a whole, it seems clear that those statutes without such prerequisite specifically incorporated are overbroad as applied to the live theater. *See* Zwickler v. Koota, *supra* 389 U.S. at 250, 88 S.Ct. 391 and cases cited therein.

16. Defendant has alluded to the Anti-Injunction statute, 28 U.S.C. § 2283. This statute does not apply in this case. Only one state court proceeding, the action for an injunction, is still pending, no final order having yet been entered by the Supreme Judicial Court. Our order will not stay those proceedings in any way. The prosecutions with which we are concerned have not yet been instituted.

cially since theater patrons may take offense from a variety of scenes, thus providing the prosecutor with a long shopping list. When faced with a prosecutor intent on extirpating lewdness in accordance with the mandate of the Supreme Judicial Court as he sees it, actors and producers will either avoid Boston altogether or will steer clear of the forbidden zone by excising constitutionally protected material in order to avoid the risk of a three year prison term. Either result is offensive to the First Amendment.

While these factors themselves constitute "irreparable injury", Dombrowski v. Pfister, *supra* 380 U.S. at 486, 85 S. Ct. 1116, we note also that plaintiffs face a substantial financial loss even if they persist in the face of multiple prosecutions and prevail. At present, the majority of advance ticket holders are willing to forego refunds in the hope that "Hair" will show again in Boston. But we agree with the court in Karalexis v. Byrne, 306 F.Supp. at 1367, that box office receipts can be expected to be smaller in the event of substantial delay, or, we may add, substantial disruption of scheduled performances. We therefore conclude that plaintiffs have demonstrated the kind of grave threat to protected expression which justifies federal equitable intervention as an alternative to repeated prosecutions.

 We reach this conclusion despite the fact that the prosecutor in this case has shown no subjective bad faith. In Robinson v. Bradley, 300 F.Supp. 665 (D.Mass.1969), the author of this opinion commented in dicta that *Dombrowski* and its offspring, Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L. Ed.2d 182 (1965), could be read as requiring both a facially invalid statute and bad faith in order to justify federal intervention. On further consideration, the better view seems to be that either is sufficient. *Cameron* does emphasize the elements of bad faith in *Dombrow-*

*ski,* but only in discussing whether bad faith enforcement of an admittedly valid statute would justify an injunction. Cameron v. Johnson, *supra* 390 U.S. at 618–619, 88 S.Ct. 1335. Moreover, the issue which both *Cameron* and *Dombrowski* address is whether constitutional rights are threatened with irreparable injury. We see little difference between the injury inflicted by multiple prosecutions brought to harass and the injury caused by multiple prosecutions motivated by a sincere desire to enforce the law. The chilling effect on protected expression is the same in either case. We therefore conclude that the threat of multiple prosecutions under an overly broad statute regulating speech is sufficient to justify federal equitable relief. *Accord*: Cambist Films, Inc. v. Illinois, 292 F.Supp. 185, 189 (N.D.Ill. 1968); Harris v. Younger, 281 F.Supp. 507, 510 (C.D.Cal.1968), restored to calendar, 395 U.S. 955, 89 S.Ct. 2095, 23 L.Ed.2d 744 (1969); Maraist, Federal Injunctive Relief Against State Court Proceedings: The Significance of Dombrowski, 48 Texas L.Rev. 535, 583 n. 234 (Feb.1970).

In sum, live theater productions are not insulated from good faith prosecution under a statute which passes constitutional muster. But at the moment the people of Boston and much of New England are being denied the opportunity to judge the merits of "Hair" for themselves, not because it may be obscene but because of the promise of prosecution under section 16 and the common law crime of indecent exposure. All we hold is that those laws authorize greater state interference with the live theater than the First Amendment allows.

Defendant and his agents are enjoined from prosecuting "Hair" under either section 16 or the common law of indecent exposure, such injunction to issue in one week to give defendant, should he desire, the opportunity to apply to the Circuit Justice for a stay.

## APPENDIX

Opinion of Supreme Judicial Court of Massachusetts, P. B. I. C., Inc. et al v. District Attorney of Suffolk County, April 9, 1970

In this case, reserved and reported without decision by a single justice, injunctive relief is sought against prosecution of the producers and members of the cast of a performance called "Hair," for violation of G.L. c. 272, §§ 16 and 32. Declaration is sought that prosecution would contravene various constitutional provisions. Each justice participating has seen the performance at the request of the parties. One scene shows members of the cast in the nude facing the audience. One nude male performer is bathed on stage. There is incidental stage action which a jury could conclude was clowning intended to simulate sexual intercourse or deviation. This appears to be less realistic than the conduct discussed in People v. Bercowitz, 308 N.Y.S.2d 1 (Cr.Ct.N.Y.). The play in various respects will be offensive to some persons. It constitutes, however, in some degree, an obscure form of protest protected under the First Amendment. Viewed apart from the specific incidents mentioned above, it is not lewd and lascivious, whatever other objections there may be to it. The incidents, already mentioned are separable from, and wholly unnecessary to, whatever theme this noisy, disorganized performance may have. Discretionary equitable jurisdiction, infrequently exercised, exists to restrain enforcement of an unconstitutional criminal statute or unconstitutional application of a valid statute. See Slome v. Chief of Police of Fitchburg, 304 Mass. 187, 188, 23 N.E. 2d 133; Kenyon v. Chicopee, 320 Mass. 528, 531, 535, 70 N.E.2d 241. Reasonable doubts are asserted whether the statutes cited have application to dramatic performances (cf. Re Giannini, 69 Cal.2d 563, 570–577, 72 Cal.Rptr. 655, 446 P.2d 535), and whether, if so applied, these statutes may be unconstitutionally vague. See Alegata v. Commonwealth, 353 Mass. 287, 293, 231 N.E.2d 201. Injunctive relief will be given, but, by analogy to the principle that he who seeks equity must do equity, the injunction, to be framed in the county court, shall be conditioned upon excision forthwith of the specified lewd features so as (a) to have each member of the cast clothed to a reasonable extent at all times, and (b) to eliminate completely all simulation of sexual intercourse or deviation. Nothing in this opinion or any injunction is to preclude prosecution for any misuse of the national flag, a matter not argued to us.

GARRITY, District Judge (dissenting).

I do not agree with the majority. I believe, in view of the recent trend toward nudity and performance of sexual acts on stage, that an occasion may arise in which a prosecution under Mass.G.L. c. 272, § 16,[1] may be warranted and brought without conflicting with the First and Fourteenth Amendments to the Constitution of the United States. Whether the Boston production of "Hair" presents such an occasion is not a controlling issue. Under the specific jurisdiction granted a three-judge district court by 28 U.S.C. § 2281, the court has ruled on the constitutionality of the statute as applied to theatrical productions generally and not on the merits or demerits of "Hair" (accordingly at the hearing the court declined plaintiffs' invitation to see the show). In my opinion, the statute proscribing open and gross lewdness is susceptible to a construction by the Massachusetts courts which would save it from overbroadness as applied to the theatre, Karalexis v.

---

1. No purpose will be served by discussing separately in this opinion the common law crime of indecent exposure, which dates back at least to 1663 when a defendant was indicted at common law for showing his nude body in a balcony in Covent Garden before a number of people. LeRoy v. Sidley, 1 Sid. 168, 82 Eng.Reprint 1036. The controlling considerations seem to be the same.

Byrne, D.Mass., 1969, 306 F.Supp. 1363, 1367, and the court should therefore abstain from ruling on its constitutionality. Douglas v. City of Jeannette, 1943, 319 U.S. 157, 162–165, 63 S.Ct. 877, 87 L.Ed. 1324.

It is, of course, indisputable that live theatrical productions are protected by the First and Fourteenth Amendments, Joseph Burstyn, Inc. v. Wilson, 1952, 343 U.S. 495, 502–503, 72 S.Ct. 777, 96 L.Ed. 1098, and for purposes of this opinion I shall assume that the scope of this protection may ordinarily be determined only by application of the three-part obscenity test stated in A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Com. of Massachusetts, 1966, 383 U.S. 413, 418, 86 S.Ct. 975, 16 L.Ed.2d 1, as qualified by Ginzburg v. United States, 1966, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31. It is clear that the particular method of expression is highly relevant. As stated by Lumbard, C. J., dissenting in United States v. A Motion Picture Film Entitled "I Am Curious-Yellow", 2 Cir., 1968, 404 F.2d 196, 203, "Because of the nature of this medium, sexual scenes in a motion picture may transcend the bounds of constitutional protection long before a frank description of the same scenes in a book or magazine. Cf. Landau v. Fording, 245 Cal.App.2d 820, 54 Cal.Rptr. 177 (1966), aff'd per curiam, 388 U.S. 456, 87 S.Ct. 2109, 18 L.Ed.2d 1317 (1967)." Specific if cursory consideration must therefore be given to certain aspects of the theatre.

Live theatre is a unique medium of expression, quite different from literature, painting, music, movies and television. As stated by Elmer Rice, The Nature of Theatre in The Living Theatre, 27–28 (1959),

"Books, pictures, statutes are addressed to the solitary reader or viewer; music may be performed and enjoyed by one or two individuals. But plays are written to be communicated to a numerous group gathered in one place at one time. The organization and assemblage of the group call for a special set of procedures, and the difference between a collective response and an individual response is not only one of degree, but one of kind.

\* \* \* \* \* \*

"These two collective characteristics of the theatre—the audience and the executants—produce a third: its public nature. Other works of art may be enjoyed not only by individuals, but in private. Failing a publisher or an exhibitor, a poem or a painting may be passed from hand to hand. Or, if it is considered subversive or indelicate, and hence socially unacceptable, it may be read or displayed in a locked room behind drawn blinds. But the essence of a dramatic performance is that it is public."

A theatrical production has a special impact upon the audience. J. B. Priestley, The Art of the Dramatist, 5, 10 (1957), described it as follows:

"We are looking at and listening to people who are known to us as actors and actresses, staying at the Midland, but who are also farmers' beautiful innocent daughters and rich glossy scoundrels from the big city. Everybody and everything on the stage have this double character; they are seen in the strange light and shadow of belief and disbelief; they belong to a heightened reality that we know to be unreal. It is this experience, unlike any other, that I call dramatic experience, and that the Theatre exists to provide for us.

\* \* \* \* \* \*

"Anybody in search of pure thought will be well advised not to sit in a building with a thousand other people, a large company of actors, and an orchestra; better find a quiet corner at home and read a few books. Even a Marxist playwright catering for a Marxist audience is not dealing in thought—and, indeed, why should he when they are all in agreement and he cannot tell them anything they did not know before? Nobody in his senses

goes to the theatre to be told what to think. What we enjoy in the theatre is that particular kind of experience I call dramatic experience, to which we contribute by allowing our minds to function on two different levels at the same time."

The theatre's proximity and access to the audience and its immediacy and unpredictability have been noted in the majority opinion. These features are enhanced in some modern productions, of which "Hair" is a good example. At times the cast comes into the audience.[2] During curtain calls at the end of the play the audience is encouraged to come onto the stage to dance with the cast. The action is often improvised. There is no indication in the script of "Hair", which contains numerous stage directions, that the cast will disrobe and stand facing the audience at the end of the first act; in this scene, which did not appear in the original or so-called "Cheetah" production of the show, each member of the cast decides for himself or herself at each performance whether or not to disrobe and face the audience.[3] The immediacy of stage presentations obviously distinguishes the theatre from other media of communication which convey only "the description or representation of sexual matters," A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Com. of Massachusetts, *supra* 383 U.S. at 418, 86 S.Ct. at 977.

Theatre patrons form a captive audience to an extent not comparable to readers who may put aside a book or magazine or even to moviegoers who usually come and go freely in the relative privacy and semidarkness of the movie playhouse. The typical theatre patron, perhaps influenced by the price he has paid for his ticket and reluctant to disturb persons next to and behind him, will normally stay at least to the end of any act in progress.

Young people are seldom if ever excluded from theatre audiences, as they are from seeing movies rated "X" or "R" by an association of motion picture producers. The producers of the Boston production of "Hair" made a faint effort to discourage attendance by children but none at all to exclude them. I doubt very much that the average patron of "Hair" is as forewarned of the content of the show and as willing to witness it as plaintiffs assume—the only evidence on this point was a collection of critical reviews phrased in generalities. He probably is aware of the nudity at the end of the first act, but not of the scene in the second act in which a nude male is bathed and fondled nor of the several simulated sex and unnatural acts.[4] There is reason to believe that many customers are drawn by the music. As alleged in paragraph 5 of the complaint, "Two of the songs from the production have become contemporary classics, 'The Age of Aquarius' having been utilized as a key theme by the Peace Corps in its public relations activities, and the song 'Let the Sunshine In' having been adopted as the theme for The Summerthing Festival 1970 for the City of Boston. Both of these songs are repeatedly played over the air, used as production numbers on television and are on

2. E. g., an actor clad in a tank type bathing suit climbs over persons in the audience and stops in front of a woman patron, spreading his legs and half sitting in her lap.

3. The ultimate in improvisation appears to have been authorized by the producers of "Che", People v. Bercowitz, 308 N.Y.S.2d 1, p. 7, NYC Crim.Ct., Feb. 25, 1970, in which a stage direction permitted the cast "to perform any sex act on stage at any time, if they felt spontaneously that actual sex would enhance the realism of their performance."

4. The same may almost certainly be said of much of the language, e. g., the song: "Sodomy Fallatio Cunnilingus Pederasty Father Why do these words Sound so Nasty? Masturbation Can be fun Join the holy orgy Kama sutra everyone" and the conversation about the weather in which the word "fuck" appears six times in six lines.

various best seller lists of current records." The critical review in Newsweek magazine stated,

"Coupled with the large doses of advance publicity, it is the music, Galt McDermot's amalgam of pounding rock and Broadway melody, that has propelled 'Hair' into its wide preacceptance. There are already nine 'Hair' LP's and 60 groups have recorded songs from the show that are broadcast round the world."

The issue of the applicability to stage productions of statutes punishing open and gross lewdness is of more moment than it would have been a few years ago or even before the current "off-Broadway" season in New York City when a group of plays led David Merrick, the renowned producer, to write an article for the March, 1970 edition of The Reader's Digest entitled, "Must Smut Smother the Stage?" stating in part:

"In *Oh! Calcutta!* ten men and women stripped naked and acted out sexual perversions. *And Puppy Dog Tails*, a play about homosexuals, had a vapid story line used only as an excuse to have men go to bed together, giving the audience a brief view of their genitals. When the curtain went up on *Fortune and Men's Eyes* on opening night, the audience was treated to the sight of a man defecating. This was followed by a scene in which one nude boy rapes another in a shower, and then by a scene in which a boy masturbates while listening to the sounds of a boy he loves being whipped.

"Since the days when Romans were entertained by hired actors performing scenes of sodomy, rape and incest, the theater has labored to shed the ancient stigma of immorality. Only within the past few decades has that battle been won. And now, this!

"Alert to the possibility of public outrage, producers of the dirty shows generally attempt to dress their pornography in sociological or philosophical garments. Thus *Fortune and Men's Eyes* is set in a prison, and its scenes of homosexuality and masochism are presented as a plea for prison reform."

Whether theatrical producers and actors can be charged constitutionally with "open and gross lewdness and lascivious behavior" under Mass.G.L. c. 272, § 16, should take into account whether the show involved is obscene under the *Memoirs-Ginzburg* test. If it is, then the conduct on stage, even if expression, is not protected by the First and Fourteenth Amendments and I see no sufficient reason why the defendants should not be charged with lewdness in addition to or alternatively to obscenity. This is not to deny that a cogent reason may be advanced for barring lewdness prosecutions even in cases of obscenity, viz., that the mere availability of the statute in some case will have a "chilling effect", Note, The Chilling Effect in Constitutional Law, 69 Colum.L.R. 808 (1969), upon freedom of expression in the theatre. But I am not persuaded. After all, the lewdness proscribed by § 16 does not mean dirty words or suggestive gestures. It means exposing the genital parts without necessary or reasonable excuse. Commonwealth v. Wardell, 1880, 128 Mass. 52, 53. Any playwrights desiring to convey their ideas by means of such exposure and any actors and actresses willing to undress completely in a public place as drafty as a theatre stage will not be easily chilled.

The writer, producer, actors and set designer of the "off-Broadway" play "Che" were, in People v. Bercowitz, *supra* (308 N.Y.S.2d p. 12), convicted of violating a lewdness statute [5] substantially the same as the Massachusetts law, having also been convicted of violating Penal Law, McKinney's Consol.Laws, c. 40, § 235.05, the obscenity statute.

5. New York Penal Law, "§ 245.00 Public Lewdness. A person is guilty of public lewdness when, in a public place, he intentionally exposes the private or intimate parts of his body in a lewd manner or commits any other lewd act."

The New York statutes are helpful in a broader respect in that their location among the numerous criminal statutes enacted by that state indicates a distinction between the public interests protected by the two laws. The obscenity section appears in Article 235 entitled "Obscenity and Related Offenses" which is part of "Title M—Offenses Against Public Health and Morals." The lewdness section appears in Article 245 entitled "Offenses Against Public Sensibilities" which is part of "Title N—Offenses Against Public Order, Public Sensibilities and the Right to Privacy." This distinction, in my view, may under some circumstance, given a prior or contemporaneous finding of obscenity, warrant distinct public vindication.

The particular public interest in restricting lewdness in the theatre as distinguished from controlling obscenity in literature and other art forms has not been analyzed in judicial opinions. It has been by R. Schechner, Pornography and the New Expression, in Public Domain, Essays on the Theatre, 140, 141 (1969) stating in part:

> "In our culture we bring the family [6] with us to the movies or theatre, and even our wildest dramas, say *Lear* and *The Balcony*, are essentially reassuring and passive as we produce them. Were we to go to the movies or theatre without depositing ourselves in the protective envelope of the family, our drama would rapidly become sexualized and orgiastic. A play like Peter Weiss' *Marat/Sade,* as it was produced by the Royal Shakespeare Company, is moving in this direction. But scenic taboos continue in the theatre (less in film) because letting go would be too dangerous; the performance which has traditionally included actors and audience would soon become, as in a tribal dance, one unified activity.
>
> "The unique thing about theatre, of course, is that the actors are *there.* They never vanish into their characters. Like the Christian God who is three-in-one, every actor is two-in-one. It is this double existence that gives him his authenticity as actor. His role in our theatre is not very different from that of his primitive counterpart, who is at once dancer and god. Little overt sexuality is permitted onstage because the audience knows that what happens to the character also happens to the actor. One can understand why physical violence is feigned on stage: there are obligations to tomorrow's performance. But why not have nudity and lovemaking? It cannot simply be that human sexual response is an undependable mechanism. The Greeks, who accepted both sexuality and nudity in public life, maintained a strict decorum in their tragedies. It is that stage performance is always on the verge of tumbling from art back into life."

Assuming that a theatre production is not obscene, the problem is obviously more complex and is treated specifically in the majority opinion. Is an isolated (i. e., "separable from and wholly unnecessary to the theme or themes of the performance") lewd act in an otherwise non-obscene play necessarily protected expression under the First and Fourteenth Amendments? It is assumed that the production as a whole is not "utterly without redeeming social value" or that "the dominant theme of the material taken as a whole" appeals to some interest other than a prurient interest in sex. The majority answers the question affirmatively. I would not. On the assumptions stated, the act would not be "protected" because not an integral part of the production as a whole; nor "expression" because not communicative. "We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." United States v.

6. In this context, "family" has been defined by the author as "a few others who are emotionally close to us."

O'Brien, 1968, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672.

But, one might object, everything done on stage during a theatrical performance is part of an artistic whole and judges are not qualified to overrule playwrights and producers as to what is an integral part of a production and whether conduct is communicative. I suggest that such decisions are no more difficult than those required of courts under existing obscenity tests as to "dominant theme", "community standards" and "social value." Whether existing standards permit the excision of nudity and overt sexuality added to a production for no purpose except to shock and offend, is another question. United States v. A Motion Picture Film Entitled "I Am Curious-Yellow", *supra*, 404 F.2d at 199, says that they do but it does not say how, short of applying the three-pronged *Memoirs* test to the balance of the production from which the irrelevant nudity is presumably isolated,

> "The exhibition in a motion picture of an isolated instance of sexual intercourse or of irrelevant nudity, which would indeed be equivalent to public display, could be halted under the established standards, just as could similar material if it appeared in print."

No precedent or other authority is cited by the court for the proposition stated. Other courts seem unaware of any authority under existing standards to treat isolated conduct differently from the whole production. On the contrary, in applying the existing standards the tendency seems to be that a finding of a nonprurient dominant theme or any redeeming social value in a play as a whole must end inquiry into the offensiveness of any particular act during the presentation, whether or not isolated from the remainder of the performance. See, e. g., In re Giannini, 69 Cal.2d 563, 72 Cal.Rptr. 655, 661, 446 P.2d 535 (1968), Dixon v. Municipal Court of City & County of San Francisco, 267 Cal.App.2d 789, 73 Cal.Rptr. 587 (Cal. App.1968).

One obvious source of difficulty in deciding the questions raised in this case is that the existing standards have evolved in cases dealing with books and magazines and, to a limited extent, movies. The fixed forms of these media of expression necessitate their being appraised in their entirety. No such necessity exists with respect to theatrical productions, which are given trial runs and frequently revised by the addition or excision of lines, actions or even entire scenes. This feature of the changeability and separability of the parts of a theatrical production may serve to shield it against censorship. Indeed, the availability of criminal prosecution for lewdness in the theatre was mentioned in this connection by George Bernard Shaw, who in the preface to his play, "The Shewing-up of Blanco Posnet" (1909), discussed at length an inquiry into censorship by a Select Committee of both Houses of Parliament. In Shaw, Ten Short Plays 227 (1960), the noted playwright commented as follows about evidence given before the committee by Sir William Gilbert when asked whether a law sufficient to restrain impropriety in books would also restrain impropriety in plays:

> "Sir William replied: 'I should say there is a very wide distinction between what is read and what is seen. In a novel one my read that "Eliza stripped off her dressing-gown and stepped into her bath" without any harm; but I think if that were presented on the stage it would be shocking.' All the stupid and inconsiderate people seized eagerly on this illustration as if it were a successful attempt to prove that without a censorship we should be unable to prevent actresses from appearing naked on the stage. As a matter of fact, if an actress could be persuaded to do such a thing (and it would be about as easy to persuade a bishop's wife to appear in church in the same condition) *the police would simply arrest her on a charge of indecent exposure.* The extent to which this obvious safe-

guard was overlooked may be taken as a measure of the thoughtlessness and frivolity of the excuses made for the censorship." (Emphasis added.)

Finally, there has been no indication that the Massachusetts courts will apply Mass.G.L. c. 272, § 16, automatically and blindly to every episode of nudity on the Boston stage. The rescript opinion of the Supreme Judicial Court in the "Hair" case recognized explicitly the relevant constitutional issues and segregated for special consideration incidents "separable from and wholly unnecessary to" the theme of the performance. It is well settled that a state statute must be construed consistently with state court decisions which have interpreted it. Musser v. Utah, 1948, 333 U.S. 95, 97, 68 S.Ct. 397, 92 L.Ed. 562. According to Commonwealth v.' Wardell, *supra*, a violation of § 16 does not occur unless the exposure be "without necessary or reasonable excuse."

There is then sound basis in the Massachusetts law for anticipating that the Supreme Judicial Court will construe § 16 so that its applicability will depend on the relationship of the alleged violation to the theme or themes of the whole performance. If an integral part of the whole, a violation could occur only if the whole should be obscene under existing standards. If not an integral part, a violation would depend simply upon proof of the essential elements of the offense. This determination of the relationship of the alleged violation to the whole production would involve a test closely analogous to the first or "dominant theme" part of the three-pronged test for obscenity under existing standards. But if determined by this test to be isolated from the balance of the production, the court's inquiry into the essential elements of the offense would proceed without any need to explore and evaluate such considerations as "contemporary community standards" and "redeeming social value." Even as to an isolated alleged violation, surely there is room for distinctions to be drawn between scenes of naked forms merely silhouetted and unnatural acts executed in plain view. Its setting, duration, lighting on stage and other attendant circumstances, as well as consideration of any claimed expressive elements, might all combine to furnish a "necessary or reasonable excuse." In my understanding this is not a constitutionally over-broad standard when considered in terms of the very limited range of its applicability. As noted above, we are talking only about that wee area of possible First Amendment protection which finds its alleged expressive outlet in the exposition on a theatre stage of a person's private parts.